

FILED

AUG 1 4 2014

U.S. COURT OF
FEDERAL CLAIMS

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| LOUISE RAFTER, | |
| JOSEPHINE RATTIEN, | |
| STEPHEN RATTIEN, | |
| and | |
| PERSHING SQUARE CAPITAL MANAGEMENT, L.P., | **14- 740C** |
| Plaintiffs, | CASE NUMBER: _____ |
| v. | |
| THE UNITED STATES OF AMERICA, | |
| Defendant, | |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION | |
| and | |
| FEDERAL HOME LOAN MORTGAGE CORPORATION, | |
| Nominal Defendants. | |

### VERIFIED COMPLAINT

1

Plaintiffs Louise Rafter, Josephine Rattien, Stephen Rattien, and Pershing Square Capital Management, L.P. ("Pershing Square") (collectively, the "Plaintiffs"), by and through their undersigned attorneys, bring this action under the Fifth Amendment to the United States Constitution and 28 U.S.C. §1491, seeking compensation for the taking of Plaintiffs' property and derivatively asserting the breach of an implied-in-fact contract. In support thereof, Plaintiffs allege as follows:

## PRELIMINARY STATEMENT

1.      This is an action to redress an unlawful Governmental taking and the breach of an implied contract in connection with the conservatorships of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (individually, a "Company"; collectively, the "Companies"). Plaintiffs hold common stock in the Companies, the value of which has been wiped out by the actions of the Federal Housing Finance Agency ("FHFA") and the Department of the Treasury ("Treasury") (collectively, the "Government").

2.      In 2012, FHFA, purportedly acting as the conservator of the Companies, and Treasury agreed between themselves to strip all profits from the Companies and to sweep those profits to Treasury every quarter, in perpetuity (the "Net Worth Sweep Agreements").

3.      That Government confiscation of the entire net worth of the Companies is specifically intended not just to reap a windfall for the Government but to deprive the Companies' common shareholders of any economic value in their shares. And through the confiscation, Treasury and FHFA simultaneously seek to "expedite the wind down of Fannie Mae and Freddie Mac."

4.      The Government's brazen conduct in establishing the self-dealing Net Worth Sweep Agreements and requiring the ongoing quarterly sweeps (the "Net Worth Sweeps") is illegal. It violates the Fifth Amendment to the United States Constitution, which prohibits the taking of private property for public use without just compensation, and breaches an implied-in-fact contract with the Companies' boards of directors.

5.      The Housing and Economic Recovery Act of 2008 (the "Act" or "HERA") obligates FHFA as conservator to "put [a Company] in a sound and solvent condition," "carry on [its] business," and "preserve and conserve [its] assets and property." HERA gives the conservator no authority to liquidate or wind down the Companies, much less to confiscate their entire net worth.

6.      Treasury and FHFA decided to take the Companies into conservatorship soon after the enactment of HERA in 2008. HERA had granted Treasury temporary authority to purchase securities of each Company until the end of 2009. Shortly after appointing itself conservator in September 2008, FHFA entered into a Senior Preferred Stock Purchase Agreement with Treasury with respect to each Company (the "Stock Purchase Agreements"). Those Stock Purchase Agreements allowed each Company to draw funds from Treasury in exchange for various interests and compensation, including a quarterly dividend at a fixed annual rate of 10% in cash or 12% in kind. Those basic terms remained in place until Treasury and FHFA radically altered them, in effect creating an entirely new security, through the 2012 Net Worth Sweep Agreements.

7.      Congress chartered Fannie Mae and Freddie Mac to operate as privately owned, for-profit corporations. Their stock was widely held before conservatorship and remains so today. Plaintiffs in this action include a retired nurse who has held common shares of Fannie

3

Mae for approximately 25 years, and a retired psychiatric social worker and a retired scientist who have held common shares of Fannie Mae for approximately 15 years.

8.     HERA makes clear Congress's intent to "maintain [each Company's] status as a private shareholder-owned company." 12 U.S.C. §§ 1455(l)(1)(C)(v), 1719(g)(1)(C)(v). Under HERA, only in receivership—in contrast to conservatorship—can the rights of shareholders be "terminate[d]," *id.* § 4617(b)(2)(K)(i), and even then, the Act gives shareholders procedural protections, including the right to seek judicial review. Indeed, upon taking the Companies into conservatorship and entering into the Stock Purchase Agreements with Treasury, then-FHFA Director James B. Lockhart publicly affirmed that, during conservatorship, the Companies' stock would remain outstanding and continue to trade, and *"[s]tockholders w[ould] continue to retain all rights in the stock's financial worth."* (emphasis added.) As then-Treasury Secretary Henry M. Paulson stated on September 7, 2008, *"conservatorship does not eliminate the common stock."* (emphasis added.)

9.     The Companies' financial results had improved markedly by 2012. By the end of the second quarter of 2012, both Companies were profitable, with the prospect of exceptionally large profits in the future.

10.     Treasury's authority to purchase securities of the Companies had expired *years earlier.* But Treasury nevertheless devised the Net Worth Sweep Agreements with the intention of preventing the Companies' other shareholders from ever realizing any economic benefit from their shares, of seizing all of the Companies' profits for itself, and of furthering its long-held plan to liquidate the Companies. It is no coincidence that Treasury and FHFA executed the Net Worth Sweep Agreements just days after the Companies publicly disclosed their second quarter 2012 results showing strong profitability.

4

11.     Treasury has reaped an enormous windfall from the Net Worth Sweeps.  As a result of the Net Worth Sweeps, from 2013 through September 2014, the Government will have expropriated approximately *$130.5 billion more* from the Companies than it was owed under the fixed 10% cash dividend option established in the Stock Purchase Agreements ($163.4 billion versus $32.9 billion).  As of September 2014, the Government will have stripped and swept approximately *$31 billion more* from the Companies than it had invested in them ($218.5 billion versus $187.5 billion).

12.     The Net Worth Sweeps have continued unabated:  every quarter, FHFA—purportedly acting as the Companies' conservator—directs each Company to pay its entire earnings to Treasury, in cash, without regard to any other shareholders.  The scale of the confiscation is vast:  the $31 billion that the Government has to date swept from the Companies above what it had invested in them equals 4.6% of the total U.S. federal budget deficit during fiscal year 2013.  The Congressional Budget Office estimated in February 2014 that the Net Worth Sweeps in 2014 alone will equal 0.5% of this year's U.S. gross domestic product.

13.     Moreover, under the terms of the self-dealing Net Worth Sweep Agreements, not only does Treasury receive the entire net worth of both Companies, but its liquidation preferences remain intact and undiminished.  (Treasury's liquidation preference for each Company comprises an initial $1 billion liquidation preference plus the amount of Treasury's capital infusions into the Company.)  Thus, if and when FHFA is ultimately appointed receiver for the depleted Companies, Treasury having expropriated all of their profits, Treasury would still stand ahead of all other shareholders with a combined, undiminished liquidation preference of *$189.5 billion.*

14.     The Government's Net Worth Sweeps do not just harm the Companies' other shareholders. They eviscerate and imperil the Companies. Freddie Mac has indicated that "as a result of the net worth sweep dividend provisions of the senior preferred stock, [it does] not have the authority to build and retain capital from the earnings generated by [its] business operations and will not be able to build or retain any net worth surplus or return capital to stockholders other than Treasury." Fannie Mae has repeatedly warned that it will not be able to withstand any serious economic downturn because it cannot build or retain any capital as a result of the Net Worth Sweeps. Rather than conserving the Companies' assets, Defendants are confiscating the entire net worth of the Companies and effectively liquidating them under the guise of conservatorship.

15.     Defendants' conduct is unlawful. It violates FHFA's statutory authority and obligations as the conservator of each Company to preserve and conserve the assets of the Companies. And it represents an expropriation of all value from the Companies' equity holders for the Government's sole benefit. The Net Worth Sweeps make Plaintiffs—and all of the other common shareholders—"shareholders" in name only, rather than the ultimate owners of the Company that the law entitles them to be. The Government's perpetual confiscations strip them of all economic value in their shares.

16.     To make matters worse, the Government has doubled down on its unlawful confiscation of the entire net worth of the Companies, by claiming that the shareholders have no right to the procedural protections that they would receive if the Government took the Companies into receivership, which is the only legal way under HERA for the Government to liquidate the Companies and terminate their shares. Treasury and FHFA chose to take the Companies into conservatorship, and have no authority to flout the clear distinction that HERA

6

draws between conservatorship and receivership. Indeed, the Government's actions directly contradict its own prior statements of its obligations and responsibilities as conservator. In September 2008, for example, FHFA publicly emphasized that "[u]nder a conservatorship, the Company is not liquidated. . . . The Conservator cannot make a determination to liquidate the Company. . . . Receivership is a statutory process for the liquidation of [the Company]." FHFA even issued a final rule in 2011 with commentary explaining that "allowing capital distributions to deplete [a Company's] conservatorship assets would be inconsistent with the agency's statutory goals." The Government's claim now that the shareholders and the courts have no power to stop its unlawful conduct is incorrect, contrary to its own public statements, and antithetical to the rule of law.

17. Accordingly, through this action, Plaintiffs seek the just compensation to which they are entitled under the Fifth Amendment. Plaintiffs also seek to recover for the Companies the damages to which they are entitled from the Government's breach of its contractual obligations.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this action and venue is proper in this Court, pursuant to 28 U.S.C. §1491(a)(1), because this suit asserts claims against the United States founded upon the Fifth Amendment and an implied-in-fact contract to which the United States is a party.

19. Pursuant to Rule of the Court of Federal Claims 23.1(b)(2), this is not a collusive action to confer jurisdiction that this Court would otherwise lack.

## PARTIES

20. Plaintiff Louise Rafter is a retired nurse who resides in California. She owns 36,000 shares of Fannie Mae common stock, some of which she and her late husband purchased

over 25 years ago and which she and/or her late husband have held continuously since then.  She brings claims as a common shareholder of Fannie Mae only; she does not bring claims with respect to Freddie Mac.

21.     Plaintiffs Josephine and Stephen Rattien are a married couple who reside in Washington, D.C.  Josephine Rattien is a retired psychiatric social worker and inner-city school counselor.  Stephen Rattien is a retired senior science and technology policy manager.  They jointly own 1,000 shares of Fannie Mae common stock, which they purchased approximately 15 years ago, and which they have held continuously since then.  They bring claims as common shareholders of Fannie Mae only; they do not bring claims with respect to Freddie Mac.

22.     Plaintiff Pershing Square is a limited partnership duly organized and existing under the laws of Delaware, and its principal place of business is 888 7th Avenue, 42nd Floor, New York, New York 10019.  It is an investment advisor to private investment funds registered with the Securities and Exchange Commission under the Investment Advisor Act of 1940.  Pershing Square primarily manages funds that are in the business of investing in securities.  Pershing Square is the Companies' largest common shareholder, with an approximate 10% stake in the outstanding common stock of each Company.  It brings claims with respect to both Companies.

23.     Defendant United States of America includes Treasury, FHFA, the Secretary and Director thereof, respectively, and agents acting at their direction.

24.     Nominal Defendant Fannie Mae is a congressionally chartered, privately owned Delaware corporation with its principal executive offices located at 3900 Wisconsin Avenue, N.W., Washington, D.C. 20016.

8

25.     Nominal Defendant Freddie Mac is a congressionally chartered, privately owned Virginia corporation with its principal executive offices located at 8200 Jones Branch Drive, McLean, Virginia 22102.

## CONSTITUTIONAL AND STATUTORY PROVISIONS

26.     Plaintiffs' takings claim is founded on the Fifth Amendment to the United States Constitution, which provides in pertinent part that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." Plaintiffs' contract claim is founded on 28 U.S.C. §1491(a), which provides a cause of action upon an "implied contract with the United States."

## FACTUAL ALLEGATIONS

27.     Fannie Mae and Freddie Mac are congressionally chartered, private stockholder-owned corporations. They perform the critical role of increasing liquidity, stability, and affordability in the mortgage market so that lenders can provide more homebuyers with long-term, low-cost financing. They do so by, among other things, purchasing mortgages and bundling these mortgages into mortgage-backed securities that are sold to investors.

28.     The Companies issued publicly traded securities, including common stock and numerous classes of non-cumulative preferred stock. The common and preferred stock has been purchased by, among others, public pension funds; mutual funds; community banks; insurance companies; religious charities, including those dedicated to encouraging affordable housing; and individual investors, including Mrs. Rafter and Dr. and Mrs. Rattien. The stock continues to trade.

29.     By 2008, the Companies were two of the largest financial institutions in the world—owning and guaranteeing trillions of dollars of assets. Prior to 2008, they regularly declared and paid dividends to their shareholders, and were generally considered a low-risk

investment, including for individual investors such as Mrs. Rafter and Dr. and Mrs. Rattien. Fannie Mae had not reported a full-year loss since 1985, and Freddie Mac had not since 1989.

### The Housing Crisis and HERA

30.     Beginning in late 2006, the housing market suffered a substantial decline in value, leading to an increasing number of delinquent and defaulted mortgages. As a result, Fannie Mae's and Freddie Mac's guarantee and investment portfolios decreased in value. Both Companies experienced net losses beginning in 2007. However, those losses were largely due to credit provisions—which represent *estimates* of future credit losses—that ultimately proved excessive. Actual credit losses from 2007 to 2011 were approximately $140 billion less than anticipated. A significant portion of the losses recorded in that period related to the write-down of deferred tax assets, which the Companies would be able to reverse when they returned to profitability. Because of these adjustments, the Companies had less operating cash available.

31.     As the housing and financial crisis deepened, Congress enacted HERA in July 2008. That Act created FHFA and consolidated regulation of the Companies under it. 12 U.S.C. § 4511.

32.     As relevant here, the Act has two major features. First, it provided Treasury temporary authority to purchase "obligations and other securities" of the Companies. 12 U.S.C. §§ 1455(l)(1)(A), 1719(g)(1)(A). The Act authorized these purchases only upon specified findings by the Secretary of the Treasury. The Secretary was required to consider enumerated factors, including the "need to maintain [each Company's] status as a private shareholder-owned company." *Id.* §§ 1455(l)(1)(C)(v), 1719(g)(1)(C)(v). Importantly, the Act clearly provides that Treasury's emergency purchase authority expired on December 31, 2009.

33.     Second, the Act authorizes FHFA to place the Companies into either conservatorship or receivership in certain circumstances. The statute carefully distinguishes

between FHFA's powers as a conservator and as a receiver. In a section describing general powers applicable to either, the Act authorizes FHFA to do a variety of things, including "preserv[ing] and conserv[ing] the assets" of the Companies, but not liquidating them or winding them down. *Id.* § 4617(b).

34.     HERA then specifically delineates FHFA's additional "Powers as conservator." Those include taking such action as may be necessary to "put the [Company] in a sound and solvent condition," "carry on" its business, and "preserve and conserve" its "assets and property." *Id.* § 4617(b)(2)(D)(i) and (ii). These powers of the conservator do not confer any authority to extract all profits from, liquidate, or wind down the Companies, which would be antithetical to the purpose of a conservator.

35.     Only in the next section, titled "*Additional* powers *as receiver*," does the Act authorize—indeed, require—FHFA to liquidate a Company. *Id.* § 4617(b)(2)(E) (emphasis added). Under the Act, receivership terminates any existing conservatorship and triggers an immediate right to judicial review. It also mandates numerous other special procedures, including a detailed process for the receiver to determine claims against a Company, which again incorporates an express right to judicial review.

36.     The Act additionally specifies that, as either conservator or receiver, FHFA "shall not be subject to the direction or supervision of any other agency of the United States . . . in the exercise of [its] rights, powers, and privileges . . . ." *Id.* § 4617(a)(7).

**FHFA Becomes the Companies' Conservator**

37.     In July 2008, James Lockhart, Director of the Office of Federal Housing Enterprise Oversight ("OFHEO") and soon thereafter Director of FHFA, made clear in a public statement that the Companies were "adequately capitalized, holding capital well in excess of [regulatory requirements]" and had "large liquidity portfolios, access to the debt market and over

$1.5 trillion in unpledged assets." Testifying before Congress that same day, both Henry Paulson, then-Treasury Secretary, and Benjamin Bernanke, then-Chairman of the Federal Reserve, echoed the OFHEO Director's statements that each Company was "adequately capitalized," which meant that the Company met or exceeded all of its risk-based, minimum, and leverage capital requirements. In letters to each Company dated August 22, 2008, FHFA found that each Company met all relevant capital requirements, including additional capital requirements imposed by FHFA above the statutory minimums and the requirements arising from FHFA's risk-based capital stress test.

38.     Just two weeks later, Treasury and FHFA sought the consent of the Companies' boards of directors to place the Companies in conservatorship. Director Lockhart explained in September 2008 that "the goal of these dual conservatorship actions is to help restore confidence in Fannie Mae and Freddie Mac, enhance their capacity to fulfill their mission, and reduce the systemic risk that would have exacerbated the instability in the current market." Upon information and belief, the conservatorship and the accompanying injection of capital benefited the Government's broader purpose by avoiding the need for the Companies to scale back their mortgage market activities or sell mortgage-backed assets in order to improve their capital ratios.

39.     Confidence in the solvency of the Companies was critical to the financial system; they guaranteed approximately $3.6 trillion of mortgage-backed securities and had issued approximately $1.7 trillion in debt held primarily by financial institutions. Diminished confidence could have affected the valuation of these assets and the solvency of other financial institutions. Diminished confidence in the Companies' guarantees could also have adversely affected investment in mortgage assets and the rates required for mortgage loans.

40.     By choosing a conservatorship to achieve these goals, FHFA committed to specific statutory duties and limitations as conservator, which prevented it from liquidating the Companies or gutting their assets and property. Upon information and belief, FHFA obtained the consent of the Companies' boards of directors to conservatorship in part on the ground that conservatorship would serve the interests of their shareholders. Conservatorship, unlike receivership, does not "terminate" the rights of shareholders. *Id.* § 4617(b)(2)(K)(i). Upon information and belief, in exchange for FHFA's promise, the Companies' boards agreed not to challenge FHFA's status as conservator.

### Treasury's Preferred Stock

41.     The day after the Director of FHFA appointed FHFA as conservator of the Companies, Treasury exercised its emergency authority to purchase securities of the Companies. Treasury entered into the Stock Purchase Agreements with FHFA in the latter's capacity as conservator of the Companies. In authorizing the preferred stock purchases, the Secretary of the Treasury certified that, as the statute requires, he considered "[t]he need to maintain the [Companies'] status as [] private shareholder-owned compan[ies]."

42.     For each Company, Treasury agreed to provide up to $100 billion (later amended to $200 billion) from which the Company could draw, in exchange for a special class of Treasury senior preferred shares. In each case, the Stock Purchase Agreement entitled Treasury to: (1) a first-priority liquidation preference, equal to $1 billion plus the total amount of Treasury's capital infusion to the Company; (2) a dividend payable quarterly either in cash (fixed at an annual rate of 10% of the liquidation preference), or in stock (fixed at an annual rate of 12%); (3) a "Periodic Commitment Fee," scheduled to commence in 2010 but never ultimately imposed; and (4) warrants to purchase 79.9% of the Company's common stock for a nominal price.

43.     The warrants provided Treasury with a mechanism to achieve a significant benefit if the Companies returned to profitability. Treasury at the time recognized that the warrants would "provide potential future upside to the taxpayers," while the existing common shareholders would continue to hold the rights to the value of their shares.

44.     The Stock Purchase Agreements also included provisions that assured Treasury's direct control over each conservatorship. Among other things, they forbade FHFA, without Treasury's consent, to: (1) authorize the Companies to pay any dividend or to make any other distribution on any existing equity interest other than to the Treasury senior preferred stock; (2) dispose of any assets other than for fair market value; or (3) hold debt or mortgage assets in excess of specified amounts. The Stock Purchase Agreements even prohibit FHFA, without Treasury's consent, from exercising its authority under HERA to end the conservatorship or to appoint a receiver.

45.     Treasury has exercised its direct control over the conservatorships to place the general interest of taxpayers—beyond the interest in repayment of draws and dividends—ahead of the interests of shareholders and to preclude FHFA as conservator from preserving the value of the Companies for any shareholders other than Treasury. For example, the Companies proposed to sell to third-party investors their investments in low-income housing tax credits in order to decrease their draws and dividend payments to Treasury. Treasury withheld its approval for the sale. It "stated the proposed sale would result in a loss of aggregate tax revenues that would be greater than the savings to the federal government from a reduction in the capital contribution obligation of Treasury" to the Companies under the Stock Purchase Agreements. The result was that the Companies could not sell or transfer the assets.

46.     Treasury's emergency authority to "purchase any obligations and other securities issued by" the Companies expired on December 31, 2009.  12 U.S.C. §§ 1455(l), 1719(g). Recognizing that this deadline "constrained" Treasury's "ability to make further changes to the [Stock Purchase Agreements]," Treasury officials on December 22, 2009, proposed certain changes before the authority expired.  They wrote to then-Treasury Secretary Timothy Geithner that the Companies "have moved from being a source of instability during the early stages of the crisis to a stable and critical source of mortgage financing to the market today," and that Fannie Mae and Freddie Mac had only drawn $60 billion and $51 billion, respectively, of the $200 billion available to each.  The officials nevertheless proposed changes to the Stock Purchase Agreements (changes that ultimately were adopted) to replace the fixed $200 billion cap with a formulaic cap to provide for scenarios that might arise after Treasury's purchase authority had expired.  That amendment (the Second Amendment to the amended and restated Stock Purchase Agreements), signed days before the expiration of Treasury's emergency authority in December 2009, did nothing to affect the rights of the Companies' other shareholders.

### FHFA's Duties as Conservator

47.     After the Director of FHFA appointed FHFA as conservator of each Company and executed the Stock Purchase Agreements in exchange for Treasury's support, FHFA acknowledged that the conservatorships were intended to stabilize and restore the Companies and to conserve and preserve their assets.  FHFA Director Lockhart issued a statement on September 7, 2008, explaining that conservatorship "is a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations." He emphasized that "FHFA will act as the conservator to operate the [Companies] until they are stabilized."  Once its "plan to restore the Compan[ies] to a safe and solvent condition has been

15

completed successfully," FHFA promised in a September 7, 2008 fact sheet, "the Director will issue an order terminating the conservatorship."

48.    FHFA emphasized in its fact sheet that "[u]nder a conservatorship, the Company is not liquidated. . . . The Conservator cannot make a determination to liquidate the Company. . . . Receivership is a statutory process for the liquidation of [the Company]."

49.    At the same time, FHFA publicly underscored that, during conservatorship, the Companies' stock would remain outstanding, would continue to trade, and that *"[s]tockholders will continue to retain all rights in the stock's financial worth."* (emphasis added.) Similarly, Treasury Secretary Paulson told the public on September 7, 2008 that "conservatorship does not eliminate the common stock." Indeed, the Stock Purchase Agreements make clear that even upon voluntary or involuntary liquidation or winding up of a Company, preferred and then common stockholders are entitled to receive payment or distribution of the remaining value of the Companies.

50.    Director Lockhart reaffirmed in testimony to Congress on September 25, 2008, that conservatorship "is a statutory process designed to stabilize a troubled institution with the objective of maintaining normal business operations and restoring its safety and soundness," and that FHFA would act as conservator only "until the [Companies] are stabilized."

51.    In congressional testimony in June 2009, Director Lockhart emphasized that "[a]s the conservator, FHFA's most important goal is to *preserve the assets of Fannie Mae and Freddie Mac over the conservatorship period. That is our statutory responsibility.*" (emphasis added.)

52.    In a "Strategic Plan 2009-2014" document issued in July 2009, FHFA included the following "strategic goal": "The conservatorship of Fannie Mae and Freddie Mac allows the

FHFA to preserve the assets of the [Companies], ensure they focus on their housing mission and are positioned to emerge from conservatorship as financially strong." It again emphasized that the conservatorship was "designed to stabilize troubled institutions with the objective of maintaining normal business operations and restoring financial safety and soundness."

53. Throughout 2010 and 2011, FHFA continued to reaffirm publicly its goal of returning the Companies to normal business operations. In February 2010, FHFA's new Acting Director, Edward J. DeMarco, told Senate and House leaders that "FHFA is focused on conserving the [Companies'] assets" and "put[ting] [them] in a safe and solvent condition." In a report to Congress in June 2011, FHFA touted its goals of "preserv[ing] and conserv[ing] each [Company]'s assets and property and restor[ing] the [Companies] to a sound financial condition so they could continue to fulfill their statutory mission of promoting liquidity and efficiency in the nation's housing finance markets."

54. In June 2011, FHFA issued a final rule interpreting and implementing HERA's conservatorship and receivership provisions. FHFA's interpretation acknowledged the statutory and common-sense distinction between the powers of a conservator and those of a receiver and the limitations imposed by the statute on FHFA's authority as conservator. The rule underscored that, under the statute, "[a] conservator's goal is to continue the operations of a [Company], rehabilitate it and return it to a safe, sound and solvent condition." In contrast, "[t]he ultimate responsibility of FHFA as receiver is to resolve and liquidate the [Company]."

55. In explaining its new rules, FHFA emphasized that capital distributions conflicted with its statutory obligations as conservator:

> As one of the primary objectives of conservatorship of a [Company] would be restoring that [Company] to a sound and solvent condition, allowing capital distributions to deplete the [Company's] conservatorship assets would be inconsistent with the

agency's statutory goals, as they would result in removing capital
at a time when the Conservator is charged with rehabilitating the
[Company].

56.     Several months later, in November 2011, Acting Director DeMarco told the

Senate: "By law, the conservatorships are intended to rehabilitate the [Companies] as private

firms."

### Treasury Implements Its Plan

57.     Upon information and belief, while FHFA made those statements to the public

and to Congress, the Government quietly developed a different plan.

58.     An internal memorandum to Treasury Secretary Geithner from Under Secretary of

the Treasury for Domestic Finance Jeffrey Goldstein, dated December 20, 2010, referred to a

"commitment" by the Administration to *ensure existing common equity holders will not have*

*access to any positive earnings from the [Companies] in the future*." (emphasis added.)

59.     In that memorandum, Treasury considered doing so by setting the Periodic

Commitment Fee—which the Stock Purchase Agreements required to be set "with reference to

the market value of the Commitment"—instead "equal to any generated positive net income

(subject to further legal review)." Upon information and belief, Treasury abandoned the idea of

a net worth sweep through the Periodic Commitment Fee because its legal review determined

that doing so would violate the terms of the Stock Purchase Agreements, which required the fee

to be set "with reference to the market value" of the commitment.

60.     In February 2011, Treasury issued a white paper expressing its intention to "us[e]

a combination of policy levers to wind down Fannie Mae and Freddie Mac." It stated that "[t]he

Administration will work with FHFA to determine the best way to responsibly reduce Fannie

Mae and Freddie Mac's role in the market and ultimately wind down both institutions."

Treasury's plan to wind down the Companies—a process that would start "now," Geithner

said—was contrary to the statutory limits on FHFA's authority as conservator, the statutory prohibition on any other government agency directing or supervising FHFA, and FHFA's previous public statements regarding its duties as conservator.

61.     Treasury had and exercised actual control over FHFA's conduct as conservator through pressure and influence, as well as through the terms of the Stock Purchase Agreements. And it continues to do so today.

62.     In 2012, FHFA did an about-face from its prior public statements acknowledging its statutory obligation to preserve and conserve the Companies' assets and property and to return the Companies to normal operations. Alluding to FHFA's previously expressed "understanding of its conservatorship obligations and how it planned to fulfill those obligations," Acting Director DeMarco told Congress on February 21, 2012, that "[i]t is time to update and expand that plan." He acknowledged that the change was consistent with "the white paper produced last year by Treasury." FHFA's new strategic plan recast its responsibilities and authority under HERA. Contrary to its previously stated conservatorship approach, FHFA declared that, with "taxpayers providing the capital supporting [Company] operations, [the statutory] 'preserve and conserve' mandate directs FHFA to minimize losses on behalf of taxpayers." And for the first time, FHFA suggested that its conservatorship powers allowed it to undertake "an orderly disposition of a firm."

63.     By 2012, it was clear that the Companies were returning to strong profitability. Freddie Mac had reported profits for the fourth quarter of 2011. The Companies released their results for the first quarter of 2012 in early May. Both reported profits. Fannie Mae reported "significant improvement" in its financial results, and an expectation that its financial results for 2012 would be "significantly better" than its 2011 results.

64. The Companies released their results for the second quarter of 2012 on August 7 and 8. Both Companies again reported profits, in each case substantially greater than in the first quarter. Fannie Mae again reported "significant improvement" in its results and a continued expectation of significantly better results for 2012. It noted "improvement in the housing market in the first half of 2012." Freddie Mac also noted stabilization in the housing market.

65. By August 2012, neither Company was drawing anything on its commitment from Treasury, even to pay the substantial fixed dividends to which Treasury was entitled under the Stock Purchase Agreements.

66. Before Treasury and FHFA entered into the Net Worth Sweep Agreements in August 2012, it was or should have been evident to them that the residential housing market was recovering and that the Companies had returned to strong profitability.

67. It also was or should have been evident to FHFA and Treasury that, if the housing recovery continued, accounting principles would require the Companies to greatly increase the value of their assets and decrease their loss reserves, thus recapturing most of the value lost in the preceding years. Given that both Companies had returned to profitability, Treasury and FHFA were also well aware that they would ultimately benefit from the write-up of more than $70 billion of deferred tax assets that the Companies would be able to utilize going forward.

68. Internal Treasury documents created before the Net Worth Sweep Agreements show that the decision to enter into those Agreements reflected the Government's policy decision to wind down the Companies—a policy that FHFA as conservator did not have authority to pursue and which conflicted with the interests of all of the Companies' shareholders other than Treasury.

20

69.     To justify the Net Worth Sweep Agreements, Treasury prepared an analysis showing that the Companies would be unable to pay the 10% dividend on amounts outstanding "*due to the enterprises being wound down*" (emphasis in original). This analysis projected that, starting in 2014, because of the Government's decision to wind down the Companies, their profits would be inadequate to pay the 10% dividend to Treasury, requiring them to draw down more funds from Treasury. The analysis ignored the 12% stock dividend option.

70.     Treasury based its analysis on financial projections that were outdated and, by early August 2012, were being proven too pessimistic and far off base, given the turn in the housing market and the profits realized by the Companies. For instance, the analysis projected as the "base case" that the Companies would together lose $6.4 billion in 2012. Yet Fannie Mae had already reported net income of $7.8 billion for just the first two quarters in 2012, and expectations of positive net worth for the year, and Freddie Mac had reported net income of over $3.5 billion for the same time period. The Companies together earned a profit of over $28 billion in 2012.

71.     Internal Treasury documents make clear that a principal purpose of the Net Worth Sweep Agreements was to "[r]eplace the current fixed 10% dividend with a 'net worth sweep' dividend," which would "result in Treasury *receiving all future income generated by the [Companies]*" (emphasis in original).

### The Net Worth Sweep Agreements
### and Their Effect on Shareholders Other Than Treasury

72.     On August 17, 2012, Treasury and FHFA—without regard for the expiration of Treasury's purchase authority more than two years earlier—signed the Net Worth Sweep Agreements (as a Third Amendment to the Stock Purchase Agreements). The Net Worth Sweep Agreements suspended the market-based Periodic Commitment Fee for as long as they remain in

effect and replaced the Stock Purchase Agreements' prior fixed dividend options with the perpetual quarterly Net Worth Sweeps, which pay Treasury, in cash, the difference between each Company's assets and liabilities (plus a small specified capital reserve that continually diminishes until it reaches zero by 2018).

73.    That plan has the effect of fulfilling Treasury's years-old policy of "ensur[ing]" that "existing common equity holders will not have access to any positive earnings from the [Companies] in the future." The Net Worth Sweep Agreements and the Net Worth Sweeps, implemented each quarter during conservatorship, deprive common shareholders of access to any of the value of the Companies' positive earnings, now or in the future, without affording any of the procedural protections such shareholders would have in a receivership.

74.    For Treasury, the Net Worth Sweeps have the benefit of providing significant off-budget revenue without politically unpalatable tax increases or spending cuts.

75.    After announcing the Net Worth Sweep Agreements, FHFA made vague and convoluted attempts to reconcile them with its prior position regarding the objectives of conservatorship and its own statutory duties and limitations.

76.    Treasury did not even attempt to hide its intent. In a press statement titled "Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac," Treasury acknowledged that it designed the Net Worth Sweep Agreements to "make sure that every dollar of earnings each firm generates" goes to the Government, and to "help expedite the wind down of Fannie Mae and Freddie Mac."

77.    Flouting HERA's requirements for, and limits on, conservatorship, Treasury stated that the Companies "*will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form*" (emphasis added). Contrary to FHFA's

responsibilities to preserve and conserve the assets and property of each Company, FHFA stated, "[t]his change also ensures all the [Companies'] earnings are used to benefit taxpayers."

78.     Treasury directed and continues to direct FHFA to implement the Net Worth Sweeps, notwithstanding HERA's prescription that FHFA as conservator "shall not be subject to the direction or supervision of any other agency of the United States . . . ."   12 U.S.C. § 4617(a)(7). FHFA Acting Director DeMarco admitted as much in March 2013. He stated that "[t]he Administration has made clear that their preferred course of action is to wind down the [Companies]" and that the Net Worth Sweeps reinforce that "the [Companies] will *not* be building capital as a potential step to regaining their former corporate status." Moreover, the Stock Purchase Agreements themselves cede key decisions to Treasury, such as whether and when to terminate the conservatorship.

79.     Although Director Watt has seemed to equivocate about winding down the Companies in a few recent public remarks, those ambiguous suggestions are belied by clear statements from officials at Treasury. The Government's plans for the Companies are not in doubt. In a January 2014 speech, the Treasury Secretary's Counselor for Housing Finance Policy, Michael Stegman, characterized the FHFA Director's "broad responsibilit[y]" as "wind[ing] down the GSEs." Testifying before Congress in March 2014, Secretary Lew stated that Treasury "ha[s] had a very clear policy on Fannie and Freddie, which is that we're winding them down." Likewise, the 2013 and 2014 annual reports of the Financial Stability Oversight Council—over which Treasury Secretary Jacob J. Lew presides as Chairman and whose voting members include all significant administrative bodies on U.S. financial policy—express joint views from Treasury and FHFA to "wind-down" the GSEs. A speech on June 13, 2014 by Mary

Miller, the Under Secretary of the Treasury for Domestic Finance, and FHFA's annual report to Congress, released the same day, reinforce that position.

80.     Moreover, Defendants have made clear that they are acting without regard for preserving and conserving the Companies' assets and property, or for the interests and rights of any of the Companies' shareholders other than the Government. In remarks in May 2014, for example, FHFA Director Melvin L. Watt stated: "I don't lay awake at night worrying about what's fair to the shareholders." How the shareholders other than the Government have been and continue to be treated pursuant to the Net Worth Sweep Agreements was "just not [his] responsibility." Watt added that he did not create the arrangement, and that "it's not [his] job to worry about whether it's fair or not fair." And that would not change in the future: "I just don't have time to think about what might happen in the future with the shareholders."

81.     Preserving the Net Worth Sweeps underscores Treasury's role in controlling major decisions regarding the Companies' conservatorships and leaves Defendants in violation of their statutory mandate and restrictions. In adopting the Net Worth Sweep Agreements and requiring the ensuing Net Worth Sweeps, Treasury ignored and continues to ignore its obligation to consider "[t]he need to maintain" the Companies' "status as . . . private shareholder-owned" companies, as required by HERA, 12 U.S.C. §§ 1455(l)(1)(C)(v), 1719(g)(1)(C)(v). For its part, FHFA is flouting its obligations as conservator to preserve and conserve the Companies' assets and property for the benefit of the Companies and all of their shareholders, and to put the Companies in a sound and solvent condition.

### The Net Worth Sweeps Imperil the Companies

82.     Fannie Mae has repeatedly warned that, as a direct result of the Net Worth Sweeps, it is unable to withstand a serious downturn of the kind that occurred in 2006-2008. In April 2014, for example, the Companies underwent a stress test pursuant to the Dodd-Frank Wall

Street Reform and Consumer Protection Act. Under one of the scenarios of the stress test, the "severely adverse" scenario created by FHFA, the result was that Fannie Mae would require a capital infusion from Treasury of between $34 billion and $98 billion. Fannie Mae stated that under the Net Worth Sweep Agreements, its "ability to accumulate capital is severely restricted and the [C]ompany is required to reduce its capital on a yearly basis." "The results of the severely adverse scenario are not surprising," the Company noted, given its "limited capital." The Company emphasized: "Under the terms of the [Net Worth Sweep Agreements], Fannie Mae is not permitted to retain capital to withstand a sudden, unexpected economic shock of the magnitude required by the stress test."

83.    In adopting and implementing the Net Worth Sweep Agreements, FHFA is ignoring both its duties as conservator of the Companies and its express obligations with respect to the Companies' capital requirements and limitations on capital distributions. By statute, FHFA must classify each Company's capitalization on at least a quarterly basis. Capitalization is rated on a four-step scale from "adequately capitalized"—the highest rating—to "undercapitalized," "significantly undercapitalized," and finally "critically undercapitalized," the lowest rating. A Company's classification is based on objective measures of capital, although FHFA has discretionary authority to downgrade a Company one level based on unsafe and unsound practices and other factors unrelated to capital levels. In its last classification before imposing conservatorship, FHFA classified each Company as "adequately capitalized." Barely two months later, it imposed conservatorship on each Company. Within a month thereafter, FHFA suspended indefinitely its statutory obligation to classify the Companies' capitalization. It has no authority to suspend that requirement.

84.    Neither Company may make capital distributions that would reduce its level of capitalization except in specified circumstances. By simply "suspending" the requirement that it classify the Companies' capitalization, FHFA sought unlawfully to avoid the effect of these restrictions. The Net Worth Sweeps leave the Companies with a minimal capital reserve each quarter, declining to zero by 2018. By the Companies' own admission, despite their recent, sustained profitability, this meager cushion leaves them perpetually vulnerable and unable to withstand any significant economic shock or downturn. Upon information and belief, under the statutory capital classification system, each of the Companies would be classified as "critically undercapitalized" due to the effect of the Net Worth Sweeps.

85.    FHFA thus has not only ignored its statutory duties as conservator, but has abdicated its responsibilities as a regulator as well. Failing to return the Companies to "safe and sound" condition not only deprives existing shareholders of the economic value of their shares, it puts the Companies and the economy as a whole at unnecessary risk.

### Treasury's Ill-Gotten Gains

86.    Had the Net Worth Sweeps not been implemented and had the Companies paid a cash dividend to Treasury, the prior, 10% fixed dividend would have resulted in quarterly payments from Fannie Mae and Freddie Mac to Treasury since January 1, 2013, approximately as follows:

| | Fannie Mae | Freddie Mac | Combined |
|---|---|---|---|
| March 2013 | $2.9 billion | $1.8 billion | $4.7 billion |
| June 2013 | $2.9 billion | $1.8 billion | $4.7 billion |
| September 2013 | $2.9 billion | $1.8 billion | $4.7 billion |
| December 2013 | $2.9 billion | $1.8 billion | $4.7 billion |
| March 2014 | $2.9 billion | $1.8 billion | $4.7 billion |
| June 2014 | $2.9 billion | $1.8 billion | $4.7 billion |
| September 2014 | $2.9 billion | $1.8 billion | $4.7 billion |
| Total | $20.3 billion | $12.6 billion | $32.9 billion |

87.     Since January 1, 2013, pursuant to the Net Worth Sweep Agreements, FHFA as conservator has directed each Company's board of directors to declare a cash dividend to Treasury each quarter in the amount of the Company's entire earnings.

88.     In 2013, Fannie Mae and Freddie Mac had record profits. But because of the Net Worth Sweeps, every dollar of that profit went to Treasury.

89.     To date, the Government has stripped from the Companies and swept to Treasury the following amounts under the Net Worth Sweeps:

|  | Fannie Mae | Freddie Mac | Combined |
|---|---|---|---|
| April 2013 | $4.2 billion | $5.8 billion | $10 billion |
| June 2013 | $59.4 billion | $7.0 billion | $66.4 billion |
| September 2013 | $10.2 billion | $4.4 billion | $14.6 billion |
| December 2013 | $8.6 billion | $30.4 billion | $39.0 billion |
| March 2014 | $7.2 billion | $10.4 billion | $17.6 billion |
| June 2014 | $5.7 billion | $4.5 billion | $10.2 billion |
| September 2014 | $3.7 billion | $1.9 billion | $5.6 billion |
| **Total** | **$99 billion** | **$63.9 billion** | **$ 163.4 billion** |

90.     Under the Net Worth Sweeps, Treasury has reaped on average approximately $4.5 billion more each quarter than it would have received from the pre-amendment 10% cash dividend option.

91.     In its Budget Analysis for fiscal year 2015, the Office of Management and Budget estimated that the cumulative budgetary impact of the Stock Purchase Agreements, as amended by the Net Worth Sweep Agreements, from 2008 through fiscal year 2024 will be a net gain to Treasury of over $179 billion, nearly the amount it invested in the Companies, while leaving its principal undiminished *and* retaining a separate right to buy nearly 80% of the Companies' equity for a nominal amount.

92.     Upon information and belief, FHFA will continue to direct the Companies' boards of directors to make those windfall dividend payments each quarter, indefinitely.

93.     The Net Worth Sweeps deprive the Companies' preferred and common shareholders of the economic value of their common shares.

### The Net Worth Sweep Agreement Is a Taking of Plaintiffs' Vested Property Rights Without Just Compensation

94.     Plaintiffs' ownership of common stock in the Companies vests them with certain property rights, as specified in the Companies' by-laws, prospectuses, registration statements, and applicable state law. Those rights include but are not limited to the right to participate in the Companies' future profits. The Companies' shares continued to trade for value in over-the-counter markets.

95.     As common stockholders in the Companies, Plaintiffs had reasonable, investment-backed expectations that these rights would be preserved. These rights were essential features of the Companies' common stock.

96.     Plaintiffs' interests in their common stock, including the rights described above, are cognizable property rights protected by the Fifth Amendment.

97.     The Net Worth Sweep Agreements and the dividend payments made to Treasury pursuant to them deprive Plaintiffs of these vested property rights by making it impossible for Plaintiffs to realize the future value of their ownership interest in the companies. Plaintiffs have suffered concrete harm because the Net Worth Sweep Agreements and the ensuing dividend payments ensure that the Companies will never be able to emerge from conservatorship and resume normal business operations, and they ensure that Treasury will maintain its approximately $189.5 billion total liquidation preference, which will capture any residual value of the Companies.

28

98.     By design, the Net Worth Sweeps channel the Companies' profits to Treasury, for the express benefit of the Government, at the expense of the common shareholders of the Companies. It thereby takes that property for public use, and Plaintiffs are entitled to just compensation.

99.     Indeed, as equity holders have a constitutionally protected property interest in any surplus from a Government-administered receivership, *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1296 (Fed. Cir. 1999), they likewise have a constitutionally protected property interest in the residual value of an entity in a Government conservatorship from which the Government has illegally confiscated that value.

## CAUSES OF ACTION

### COUNT I
### Just Compensation under the Fifth Amendment
### for the Taking of Private Property for Public Use

100.    Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

101.    The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

102.    In the Net Worth Sweep Agreements, the United States Government embarked on a course of action to take "every dollar of earnings each firm generates . . . to benefit taxpayers." One federal agency (FHFA, purportedly acting as conservator of the Companies) struck a deal with another federal agency (the Treasury Department) to confiscate the value of the common stock held by Plaintiffs and other investors, such that *all* future earnings of the Companies would be paid to Treasury in the form of quarterly dividends. The Net Worth Sweep Agreements have no termination date, and the Net Worth Sweeps have no impact on Treasury's priority liquidation

29

preference in the Companies. Accordingly, the arrangement will continue in perpetuity and expropriate any and all value generated by the Companies.

103.    Plaintiffs have a property interest in their common stock and reasonable, investment-backed expectations in their right to participate in the Companies' future earnings. Plaintiffs also had reasonable, investment-backed expectations in a proportionate share of any residual value in the Companies should they be dissolved or liquidated.

104.    The United States, through the Net Worth Sweeps, has destroyed these reasonable, investment-backed expectations, and has expropriated the value of Plaintiffs' property for its own use, without paying just compensation.

105.    As a result of the Net Worth Sweeps, Plaintiffs have been deprived of the future value of their common stock in the Companies.

106.    Plaintiffs are entitled to just compensation for the Government's taking of their property.

**COUNT II**
**Derivative Claim for Breach of Implied Contract**

107.    Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

108.    Plaintiffs assert this derivative claim in the right of and for the benefit of Fannie Mae and Freddie Mac. Plaintiffs will fairly and adequately represent the interests of Fannie Mae and Freddie Mac.

109.    FHFA unambiguously offered to place Fannie Mae and Freddie Mac into conservatorship under 12 U.S.C. § 4617(a)(3)(I), with certain conditions described below, and the board of directors accepted this offer. FHFA made no finding of insolvency,

undercapitalization, or any other ground to impose conservatorship under 12 U.S.C. § 4617(a)(3)(A)-(H) or (J)-(L).

110.    FHFA offered, and the boards of Fannie Mae and Freddie Mac accepted, a conservatorship that would aim to "preserve and conserve the [Companies'] assets and property" and restore the Companies to a "sound and solvent condition."  The offer was also of a conservatorship that would end when that goal was achieved.  Neither of these conditions was ambiguous.

111.    Underlying FHFA's offer was its promise that FHFA would not, as conservator, wind down or liquidate the Companies.  FHFA stated contemporaneously with its offer that it could not, as conservator, place the Companies into liquidation.  FHFA stated at the time, and for several years into the conservatorship, that its goal was instead to "restore the [Companies'] assets and property to a sound and solvent condition," which continued course of performance constitutes evidence of the offer's original terms.

112.    When consenting to the conservatorship, the boards of the Companies furnished good and valuable consideration to FHFA by agreeing to forbear from a court or legislative challenge that FHFA and Treasury feared.  This forbearance was unambiguously furnished in exchange for FHFA's promises to act to restore the Companies to a safe and solvent condition.

113.    The parties, through the acts described above, entered into an implied-in-fact contract.  The terms of that contract, as relevant here, were that FHFA would "preserve and conserve the [Companies'] assets and property," that its conservatorship would continue only until the Companies were placed in a safe and solvent condition, and that in exchange the boards of the Companies would consent to, and not challenge or litigate, such a course of action.  Both FHFA and the Companies intended that an implied contract would exist.  That contract required

31

FHFA to preserve the Companies' assets and property, and forbade it from diminishing or expropriating the Companies' assets and property. This intent was demonstrated through the offer and acceptance detailed above. FHFA's offer was not ambiguous in its terms, and the boards' acceptance was manifested in FHFA's subsequent imposition of conservatorship based on the boards' consent.

114. FHFA had actual authority, as an agency of the United States Government, to bind the United States.

115. The Net Worth Sweep Agreements breached the contract by rendering it impossible for the Companies to build and retain the capital necessary to exit conservatorship and return to normal business operations.

116. Each subsequent Net Worth Sweep payment constitutes an independent breach of that contract by depleting the Companies of capital (rather than "preserv[ing] and conserv[ing]" it), in a manner that FHFA has expressly recognized undermines the goals of conservatorship.

117. To the extent that demand on Freddie Mac's board of directors is required in order to maintain a derivative claim on that Company's behalf for breach of an implied contract, Pershing Square made such demand on May 16, 2014. This demand was rejected by FHFA, purportedly in its capacity as conservator of Freddie Mac. Specifically, FHFA, through its general counsel, sent Pershing Square a response on July 17, 2014, stating that FHFA "does not intend to authorize Freddie Mac or its directors or officers on behalf of Freddie Mac to take the action that Pershing Square demands." FHFA, in its response, also took the position that Freddie Mac shareholders do not even have the ability to file derivative suits on the Company's behalf so long as the Company remains in conservatorship.

118. To the extent that demand on Fannie Mae's board of directors would otherwise be required to maintain a derivative claim on that Company's behalf for breach of an implied contract, such demand would be futile and is excused because: (a) Fannie Mae's directors, through the Company's annual Form 10-K filings, have disclaimed any fiduciary duty or obligation to anyone other than FHFA; (b) Fannie Mae's directors, through the company's annual Form 10-K filings, have acknowledged that the Company is not managed for the benefit of its common shareholders and that they will not "consider the interests of the company [or] the holders of our equity or debt securities . . . unless specifically directed to do so by the conservator [FHFA]"; and (c) FHFA purports to have assumed all of the powers of the board of directors, and has not authorized the board of directors to entertain this claim.

119. To the extent that demand on FHFA would otherwise be required to maintain a derivative claim on Fannie Mae's behalf for breach of an implied contract, such demand would be futile and is excused. It is inconceivable that FHFA, an agency of the United States Government, would sue the Government, particularly given that FHFA's own conduct in agreeing to the Net Worth Sweep Agreement is directly at issue in this action. FHFA cannot reasonably be expected to initiate litigation challenging its own conduct as unlawful.

120. Moreover, FHFA—in its capacity as conservator of Fannie Mae—has acted at the direction, behest, or control of Treasury with respect to the Net Worth Sweep Agreement and ensuing Net Worth Sweeps. Treasury is the direct beneficiary of the Net Worth Sweep Agreement, pocketing billions of dollars at the expense of fellow shareholders as a result of the conduct challenged herein. FHFA and Treasury's overwhelming conflict of interest renders FHFA incapable of exercising independent judgment.

121.    Finally, demand on FHFA would also be futile because the Net Worth Sweep Agreement served no legitimate business purpose of Fannie Mae, and was instead designed to benefit only the Government.  That agreement thus was not the product of a valid exercise of business judgment.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully pray for an order and judgment:

a.    Awarding Plaintiffs just compensation under the Fifth Amendment for the Government's taking of their property;

b.    Awarding to the Companies damages, rescission, disgorgement, equitable restitution or appropriate relief for the United States' breach of contract;

c.    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

d.    Granting such other and further relief as this Court deems just and proper.

Respectfully submitted:     August 14, 2014.

By:   *Lawrence D. Rosenberg*

Lawrence D. Rosenberg
  *Counsel of Record*

*Of Counsel*
Thomas F. Cullen
James E. Gauch
Paul V. Lettow

JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
Tel.:  (202) 879-3939
Fax:  (202) 626-1700
ldrosenberg@jonesday.com

*Counsel for Plaintiffs*

## VERIFICATION

I, Louise Rafter, hereby verify and declare under penalty of perjury that I have reviewed the Verified Complaint, know the contents thereof, and authorize its filing. The foregoing is true and correct to the best of my knowledge, information, and belief, based on investigation of counsel. I have personal knowledge of the facts stated in the Verified Complaint regarding my personal shareholdings, which are true and correct.


Executed on August _13_, 2014.                    _Louise Rafter_
                                                  LOUISE RAFTER

## VERIFICATION

I, Josephine Rattien, hereby verify and declare under penalty of perjury that I have reviewed the Verified Complaint, know the contents thereof, and authorize its filing. The foregoing is true and correct to the best of my knowledge, information, and belief, based on investigation of counsel. I have personal knowledge of the facts stated in the Verified Complaint regarding my personal shareholdings, which are true and correct.

Executed on August ___13___, 2014.

JOSEPHINE RATTIEN

I, Stephen Rattien, hereby verify and declare under penalty of perjury that I have reviewed the Verified Complaint, know the contents thereof, and authorize its filing. The foregoing is true and correct to the best of my knowledge, information, and belief, based on investigation of counsel. I have personal knowledge of the facts stated in the Verified Complaint regarding my personal shareholdings, which are true and correct.

Executed on August ___13___, 2014.

STEPHEN RATTIEN

## **VERIFICATION**

On behalf of Pershing Square Capital Management, L.P., we, Roy J. Katzovicz and Timothy L. Barefield, hereby verify and declare under penalty of perjury that we have reviewed the Verified Complaint, know the contents thereof, and authorize its filing.  The foregoing is true and correct to the best of our knowledge, information, and belief, based on investigation of counsel.  We have personal knowledge of the facts stated in the Complaint regarding Pershing Square Capital Management, L.P.'s ownership of or beneficial interest in common shares of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation, which are true and correct.  The undersigned's execution of this verification on behalf of Pershing Square Capital Management, L.P. has been duly authorized by Pershing Square Capital Management, L.P.

Executed on August __3__, 2014.

_____
ROY J. KATZOVICZ

Executed on August __3__, 2014.

_____
TIMOTHY L. BAREFIELD