## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| LOUISE RAFTER, | |
| JOSEPHINE RATTIEN, | |
| STEPHEN RATTIEN, | |
| and | Case No. 14-740C |
| PERSHING SQUARE CAPITAL MANAGEMENT, L.P., | Judge Margaret M. Sweeney |
| Plaintiffs, | |
| v. | |
| THE UNITED STATES OF AMERICA, | |
| Defendant, | |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION, | |
| Nominal Defendant. | |

## AMENDED VERIFIED COMPLAINT

Plaintiffs Louise Rafter ("**Rafter**"), Josephine Rattien and Stephen Rattien (the "**Rattien Plaintiffs**"), and Pershing Square Capital Management, L.P. ("**Pershing Square**") (collectively, the "**Plaintiffs**"), by and through their undersigned attorneys, bring claims arising from the United States Government's ongoing unlawful appropriation of hundreds of billions of dollars in cash payments and property amounting to the entire net worth of the Federal National Mortgage Association ("**Fannie Mae**") and the Federal Home Loan Mortgage Corporation ("**Freddie Mac**") (the "**Companies**"), and, concomitantly, Plaintiffs' vested property rights in the Companies' common stock.

In support of their claims, Plaintiffs allege on personal knowledge as to themselves and their own conduct and on information and belief as to all other matters as follows:

## <u>NATURE OF THIS ACTION</u>

1.     Fannie Mae and Freddie Mac were created by Congress to foster liquidity in the residential mortgage market.  Although federally chartered, they have operated for almost half a century as for-profit corporations whose stock is widely held by private investors.  Plaintiffs, who hold common stock of both Companies, were injured when the Department of Treasury ("**Treasury**") and the Federal Housing Finance Agency ("**FHFA**") (collectively, with others identified in ¶14, the "**Government**"), revised the terms of senior preferred stock ("**Government Preferred Stock**") issued by each Company and purchased by Treasury under ostensible authority of the Housing and Economic Recovery Act of 2008 ("**HERA**").

2.     Defying HERA's mandate to "provide stability to the financial markets" and "protect the taxpayer[s]" by maintaining the Companies in "a sound and solvent condition," 12 U.S.C. §§1455(*l*)(1)(B)(i), 1719(g)(1)(B)(i), 4617(b)(2)(D)(i), the FHFA and Treasury replaced the 10% coupon on the Government Preferred Stock with quarterly "**Net Worth Sweep**" dividends, which stripped the Companies of their entire net worth, in furtherance of Treasury's

admitted intention to confiscate "every dollar of earnings that Fannie Mae and Freddie Mac generate" and "expedite the wind down" of two of the largest — and now highly profitable — privately owned financial institutions in the world.

3.      The Government's unauthorized act has and will continue to enrich the public fisc — but only by arrogating to Treasury a dividend that is far greater than the Government Preferred Stock's original 10% coupon, which itself entitled Treasury to nearly $5 billion quarterly.  Under the Government's self-dealing revision of the Government Preferred Stock's attributes, not one dollar of the Companies' $239 billion cash payments to Treasury (including the payments to be made in September 2015) has been applied to reduce the $187.5 billion principal amount of the Government's investment, and will never do so.  Instead, the Net Worth Sweeps now drain the Companies of any ability to build capital from their currently robust earnings, return capital to any investor other than the Government, or, indeed, survive a future economic downturn.  As a result, Fannie Mae and Freddie Mac have been rendered permanently unable to exit conservatorship, a process intended to stabilize, preserve and restore financial entities to independence.  The Government also gave itself a liquidation preference equal to the unredeemable principal amount of its investment plus $2 billion and all unpaid dividends, ensuring Treasury's appropriation of the Companies' entire net worth in perpetuity — all without any compensation to the Companies or their private owners.

4.      At all relevant times, the FHFA acted as conservator to the Companies under HERA, with "powers" limited to "such action as may be (i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity."  12 U.S.C. §4617(b)(2)(D).  The FHFA has never, to this day, been granted, with respect to either Company,

the "additional powers" HERA reserves to a "receiver," *id.* §4617(a)(4)(E), and therefore has never had authority to liquidate or wind down the Companies.

5.      Treasury also overreached its limited authority, under HERA, to purchase a regulated entity's securities and determine the attributes of those securities.   That authority expired at the end of 2009.   12 U.S.C. §§ 1455(*l*)(4), 1719(g)(4).   Treasury's 2012 revision of the terms of its Government Preferred Stock through the Third Amendment was tardy and unauthorized.

6.      Moreover, Treasury's authority under HERA could only be exercised: (i) upon an "emergency determination" that purchase of the Companies' securities was "necessary" to "provide stability" and "prevent disruptions" in the markets, and (ii) in a manner that "[took] into consideration," *inter alia*, the Companies' continued operation "as a private shareholder-owned company" and "plan for the orderly resumption of private market funding or capital market access."   12 U.S.C. §§1455(*l*)(l)(B)-(C), 1719(g)(1)(B)-(C).   No such determinations were made with respect to the Third Amendment, including the Net Worth Sweeps, which were implemented soon after the Companies regained indisputable profitability.   Even in the weeks before the FHFA imposed its conservatorship on the Companies in 2008, numerous officials, including the Secretary of Treasury, publicly affirmed that the Companies were sound and well-capitalized.

7.      Treasury's and the FHFA's powers under HERA did not encompass *de facto* liquidation of a stable and profitable Fannie Mae or Freddie Mac, much less a liquidation that transfers the entire net worth of those Companies to the Government for free.   Indeed, the Net Worth Sweeps were cash dividends within the definition of "capital distributions" under HERA's implementing regulations.   Those rules provide that "a regulated entity shall make <u>no</u> capital

distribution while in conservatorship," 12 C.F.R. §1237.12(a) — except in the rare case where such distribution will "enhance the ability of the regulated entity to meet the risk-based capital level and the minimum capital level for the regulated entity," "contribute to the long-term financial safety and soundness of the regulated entity," or is "otherwise in the interest of the regulated entity" or the "public interest." *Id.* §1237.12(b). Clearly, "removing capital at a time when the Conservator is charged with rehabilitating the regulated entity" would be contrary to "one of the primary objectives of conservatorship of a regulated entity [*i.e.,*] restoring that regulated entity to a sound and solvent condition." Conservatorship and Receivership, 76 Fed. Reg. 35724, 35,727 (June 20, 2011).

8.      The Net Worth Sweeps effect a taking without just compensation and/or an illegal exaction under the Fifth Amendment. They also breach the FHFA's express and implied-in-fact contractual obligations to Fannie Mae.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action, and venue is proper in this Court, pursuant to 28 U.S.C. §1491(a)(1).

## CONSTITUTIONAL, STATUTORY, REGULATORY AND CONTRACTUAL PROVISIONS

10.      Plaintiffs' claims are founded on the Fifth Amendment to the United States Constitution, which provides, in pertinent part, that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation;" HERA, 12 U.S.C. §§1455(*l*), 1719(g), 4617; 12 C.F.R. §§1229.13(1), 1237.12; 12 U.S.C. §1716, *et seq.*; 12 U.S.C. §1451, *et seq.*; 12 C.F.R. §1710.10; Fannie Mae Bylaws § 1.05; and Delaware General Corporation Law §§ 151(c), 159.

## PARTIES

11.     Plaintiff Rafter is a retired nurse who resides in California.  She owns 36,000 shares of Fannie Mae common stock, some of which she and her late husband purchased over 25 years ago and which she and/or her late husband have held continuously since then.  She brings direct claims on behalf of herself and shareholder derivative claims on behalf of nominal party Fannie Mae.

12.     The Rattien Plaintiffs are a married couple who reside in Washington, D.C. Josephine Rattien is a retired psychiatric social worker and inner-city school counselor. Stephen Rattien is a retired senior science and technology policy manager.  They jointly own 1,000 shares of Fannie Mae common stock, which they purchased approximately 15 years ago and which they have held continuously since then.  They bring direct claims on their own behalf and shareholder derivative claims on behalf of nominal party Fannie Mae.

13.     Plaintiff Pershing Square is a limited partnership duly organized and existing under the laws of Delaware, with its principal place of business at 888 7th Avenue, 42nd Floor, New York, New York 10019.  It is an investment advisor to private investment funds registered with the Securities and Exchange Commission under the Investment Advisor Act of 1940. Pershing Square primarily manages funds that are in the business of investing in securities. Pershing Square's funds together constitute the Companies' largest common shareholder, with an approximate 10% stake in the outstanding common stock of each Company.  It brings direct claims with respect to both Companies.

14.     Defendant United States of America includes the FHFA and its Director, Treasury, the Secretary of Treasury, and their agents acting at their direction (collectively, the "**Government**").

15.     Nominal party Fannie Mae is a federally chartered, privately owned corporation

with its principal executive offices located at 3900 Wisconsin Avenue, N.W., Washington, D.C. 20016.   Under its bylaws, Fannie Mae's corporate governance practices and procedures are governed by Delaware General Corporation law.

## FACTUAL ALLEGATIONS

16.     Fannie Mae was organized nearly 80 years ago, under the Federal Housing Act, to provide supplemental liquidity to the mortgage market.   Thirty years later, Freddie Mac was organized under the Federal Home Loan Mortgage Corporation Act with a mandate to stabilize the residential mortgage market and expand opportunities for home ownership and affordable housing.   Among other activities, the Companies purchase mortgages originated by private banks and bundle them into mortgage-related securities, creating a secondary market that increases the liquidity of private banks and allows them to expand the availability of mortgage finance. The Companies' publicly traded securities, including common stock and numerous classes of non-cumulative preferred stock, have historically been widely traded.   Prior to 2008, the Companies regularly declared and paid dividends to their shareholders, and were generally considered a low-risk investment.

17.     By 2008, Fannie Mae and Freddie Mac were two of the largest financial institutions in the world.   Together, they owned or guaranteed more than $5.2 trillion in mortgages — amounting to approximately 47% of all residential mortgages in the United States. Enterprise Share of Residential Mortgage Debt Outstanding 1990-2010, *available at* http://www.fhfa.gov/DataTools/Downloads/Pages/Current-Market-Data.aspx.     They were consistently profitable.   In April 2008, the Office of Federal Housing Enterprise Oversight ("OFHEO"), the Companies' regulator at the time, reported that their 2007 losses represented "Freddie Mac's first annual net loss ever, and Fannie Mae's first since 1985."   OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT, REPORT TO CONGRESS, at 10 (2008).

## July 2008 Financial Crisis and the Enactment of HERA

18.     HERA was enacted in July 2008, as part of the Congressional response to a deepening financial crisis.  As the OFHEO reported, the Companies' unprecedented 2007 losses reflected "turmoil in the housing and mortgage markets, loss of liquidity in the credit markets, and volatility in the capital markets [that] adversely impacted the financial performance of financial institutions in general, and in particular, the financial performance of institutions with significant exposure to mortgage markets.  The [Companies'] financial results suffered along with the results of other financial institutions."  *Id.*

19.     HERA established a new regulatory regime for the Companies. It replaced the OFHEO with the FHFA and gave the Companies' new regulator the power to place either Company into receivership, in addition to the power, previously granted OFHEO, to place them under conservatorship.  *See* 12 U.S.C. §4617; *cf.* Housing and Community Development Act of 1992, Pub. L. No. 102-550 §1369, 106 Stat. 3981 (1992). The statute makes unambiguous distinctions between conservatorship and receivership.  It defines the different circumstances under which the FHFA may be appointed conservator or receiver, the distinct policies and procedures governing conservatorship and receivership, the powers appurtenant to the roles of conservator and receiver, and the precise extent to which those powers are shared or exclusive to one role or the other.  HERA also gave Treasury a temporary and limited authority to stabilize either Company, if defined "emergency" circumstances so warranted, by purchasing their securities and obligations.  12 U.S.C. §§1455(*l*)(1)(A), 1719(g)(1)(A).

20.     Government officials insisted, publicly, that HERA was "not a bailout to Freddie Mac and Fannie Mae" but rather, "an infusion of confidence the financial markets need." Johnny Isakson, U.S. Senator, Floor Statement on Housing Stimulus Legislation, Statement Before U.S. Senate (July 25, 2008).  In March 2008, OFHEO had assured the marketplace that

"both [Fannie Mae and Freddie Mac] have prudent cushions above the OFHEO-directed capital requirements and have increased their reserves." News Release, OFHEO, *OFHEO, Fannie Mae and Freddie Mac Announce Initiative to Increase Mortgage Market Liquidity* (Mar. 19, 2008). At that time, OFHEO Director James Lockhart called the idea of a bailout "nonsense . . . . The companies are safe and sound, and they will continue to be safe and sound." Charles Duhigg, *As Crisis Grew, a Few Options Shrank to One*, N.Y. TIMES, Sept. 7, 2008, http://www.nytimes.com/2008/09/08/business/08takeover.html. On July 10, 2008, Lockhart reiterated that the Companies remained "adequately capitalized, holding capital well in excess of [regulatory requirements]," with "large liquidity portfolios, access to the debt market and over $1.5 trillion in unpledged assets." Press Release, James B. Lockhart, Dir., Office of Fed. Hous. Enters. Oversight (July 10, 2008).

21.     That same day, Treasury Secretary Henry Paulson and Federal Reserve Chairman Ben Bernanke both testified before the House Financial Services committee that Fannie Mae and Freddie Mac were adequately capitalized. *Paulson and Bernanke Seek Reforms*, N.Y. TIMES, July 11, 2008, http://nytimes.com/2008/07/11/business/11fed.html. Senator Isakson affirmed that "Fannie Mae and Freddie Mac have $50 billion in capital, when the requirement is to have $15 billion, so they are sound." Johnny Isakson, U.S. Senator, Floor Statement on Housing Stimulus Legislation, Statement Before U.S. Senate (July 25, 2008). On August 22, 2008, the FHFA confirmed to each Company, in writing, that it met all relevant capital requirements, including additional capital requirements imposed by the FHFA above the statutory minimums, and the requirements arising from the FHFA's risk-based capital stress test. Letter from Christopher H. Dickerson, Acting Deputy Dir., FHFA, to Daniel H. Mudd, President and Chief Exec. Officer, Fannie Mae (Aug. 22, 2008); Letter from Christopher H. Dickerson to Richard F.

Syron, Chairman and Chief Exec. Officer, Freddie Mac (Aug. 22, 2008).   In Congressional

testimony, Secretary Paulson gave HERA this rationale:  "If you've got a bazooka, and people

know you've got it, you may not have to take it out."   Andrew Ross Sorkin, *Paulson's Itchy*

*Finger,    on    the    Trigger    of    a    Bazooka*,    N.Y.    TIMES,    Sept.    9,    2008,

http://www.nytimes.com/2008/09/09/business/09sorkin.html.

<u>**September 2008 FHFA Conservatorship of Fannie Mae and Freddie Mac**</u>

22.    On September 6, 2008, however, the FHFA placed Fannie Mae and Freddie Mac

under the agency's conservatorship.  On September 23, 2008, James Lockhart, by then Director

of the FHFA, testified before Congress that "the goal of these dual conservatorship actions is to

help restore confidence in Fannie Mae and Freddie Mac, enhance their capacity to fulfill their

mission, and reduce the systemic risk that would have exacerbated the instability in the current

market."   James B. Lockhart III, Dir., FHFA, Testimony Before the Senate Committee on

Banking, Housing, and Urban Affairs (Sept. 23, 2008).

23.    In his September 7, 2008, announcement of the conservatorship, Director

Lockhart emphasized a "statutory . . . objective of returning the entities to normal business

operations" and the FHFA's own mandate to "act as the conservator to operate the Enterprises

until they are stabilized."   James B. Lockhart III, Dir., FHFA, Statement at News Conference

Announcing Conservatorship of Fannie Mae and Freddie Mac (Sept. 7, 2008).  His reference was

to HERA's strict limits on the FHFA, in its role as "conservator," to "such action as may be (i)

necessary to <u>put the regulated entity in a sound and solvent condition</u>; and (ii) appropriate to

<u>carry on the business of the regulated entity and preserve and conserve the assets and property of</u>

<u>the regulated entity</u>." §4617(b)(2)(D) (emphasis added).

24.    The FHFA draws a bright line between its potential roles as conservator or

receiver, and that dichotomy is clear throughout HERA and its implementing rules.  The agency

has explained: "The ultimate responsibility of FHFA as receiver is to resolve and liquidate the existing entity," whereas "[a] conservator's goal is to continue the operations of a regulated entity, rehabilitate it and return it to a safe, sound and solvent condition."  Conservatorship and Receivership, 76 Fed. Reg. at 35,730.  An FHFA Fact Sheet confirmed the temporary nature of the conservatorship and the agency's intention "to restore the Company to a safe and solvent condition . . . [and] issue an order terminating the conservatorship."  FHFA, Fact Sheet, at 2 (Sept. 7, 2008).  In September 2010 testimony before a Congressional subcommittee, two years into the conservatorship, FHFA Acting Director Edward DeMarco reaffirmed that the "statutory purpose of conservatorship is to <u>preserve and conserve each company's assets</u> and <u>put them in a sound and solvent condition</u> . . . [and] enhance their capacity to fulfill their mission."  Edward J. DeMarco, Acting Dir., FHFA, Testimony Before the U.S. House of Representatives Subcomm. on Capital Mkts., Ins., and Gov't-Sponsored Enters. (Sept. 15, 2010) (emphasis added).

### September 2008 Treasury Purchase of Fannie Mae and Freddie Mac Securities

25.     The day after the FHFA announced its conservatorship of the Companies, Treasury announced its exercise of its own HERA authority — to purchase the Companies' securities — which was set to expire at the end of 2009.  12 U.S.C. §§1719(g)(1), (4); 1544(*l*)(1), (4).  Secretary Paulson had told Congress two months earlier that Fannie Mae and Freddie Mac "are working through this challenging period.  Their regulator has made clear that <u>they are adequately capitalized</u>."  *Paulson and Bernanke Seek Reforms*, N.Y. TIMES, July 11, 2008, http://nytimes.com/2008/07/11/business/11fed.html.  The FHFA had confirmed that conclusion, in writing, just two weeks earlier.  Letter from Christopher H. Dickerson to Daniel H. Mudd, *supra* ¶21; Letter from Christopher H. Dickerson to Richard F. Syron, *supra* ¶21.  Nevertheless, the Secretary of Treasury made an "[e]mergency determination" that the purchase was "necessary to (i) provide stability to the financial markets; (ii) prevent disruptions in the

availability of mortgage finance; and (iii) protect the taxpayer."   12 U.S.C. §§1719(g)(1)(B);

1544(*l*)(1)(B); HERA Determination for Senior Preferred Stock Purchase Agreements (Sep. 7,

2008), *Borodkin, et al. v. Fed. Nat'l Mortg. Ass'n, et al.*, No. 1:13-cv-01443-RCL (D.D.C.), ECF

No. 11 at TREASURY-0001.

26.     On September 7, 2008, Treasury purchased, from each Company, one million

shares of the newly-created Government Preferred Stock.   In exchange, Treasury committed to

provide each Company with up to $100 billion, as needed to maintain that Company's positive

net worth.   The attributes of the two Companies' new securities were identical.   Both series: (i)

had an initial face value of $1 billion, to be increased by the amount of its issuer's draws against

Treasury's funding commitment; (ii) ranked senior in priority to any other series of the issuing

Company's preferred stock; (iii) had a liquidation preference equal to $1,000 per share (for an

aggregate of $1 billion each) plus the sum of all draws by that Company against the funding

commitment; (iv) earned an annual dividend, payable quarterly, equal to 10% of the outstanding

liquidation preference; and (v) included, in the liquidation preference, all unpaid dividends.   In

addition, each Company gave Treasury warrants to acquire 79.9% of that Company's common

stock at a nominal price.

27.     The terms of the Government Preferred Stock were revised twice in anticipation

of the year-end 2009 expiration of Treasury's temporary purchase authority, *see* 12 U.S.C.

§§1455(*l*)(4), 1719(g)(4), in both instances to confer on Treasury the ability to infuse cash after

that deadline.   In May 2009, Treasury and the FHFA increased Treasury's funding commitment

from $100 billion to $200 billion for each Company.   On December 24, 2009, Treasury and the

FHFA replaced the $200 billion fixed cap with a formulaic cap that could accommodate

increased need that might arise for years in the future.

28.     Between 2008 and August 2012, the Companies' draws on Treasury funds increased their cost to redeem the Government Preferred Stock from $2 billion to $189.5 billion. During that period, the Companies paid Treasury approximately $45 billion in dividends. The Companies' $187.5 billion draws on Treasury's funding commitment were mainly necessitated by conditions arising from the conservatorship itself, and from the terms of Treasury's investment in Government Preferred Stock.   Once conservatorship was imposed, the FHFA required the Companies to declare large non-cash losses in the value of deferred tax assets, and to book substantial loan loss reserves. Those accounting adjustments decreased the Companies' operating capital and net worth by hundreds of billions of dollars, creating deficits that triggered the draws.

29.     The FHFA examined the Companies' financial statements quarterly to determine whether they were maintaining zero net worth.  Each time a Company's liabilities exceeded its depleted assets, the FHFA requested Treasury to provide funds equal to the deficit.  Since each draw increased Treasury's aggregate liquidation preference, dividend payments amounting, eventually, to nearly $5 billion quarterly themselves triggered additional draws.

**<u>August 2012 Replacement of 10% Coupon with Net Worth Sweeps</u>**

30.     By 2012, the revival of the housing market boosted the Companies' earnings and they began to regain their profitability.  Defying the FHFA's 2008 projections, the Companies posted combined profits of more than $13 billion in the first two quarters of 2012.  Fannie Mae, Quarterly Report (Form 10-Q) at 3 (May 9, 2012); Fannie Mae, Quarterly Report (Form 10-Q) at 3 (August 8, 2012); Freddie Mac, Quarterly Report (Form 10-Q) at 1 (May 3, 2012); Freddie Mac, Quarterly Report (Form 10-Q) at 1 (August 7, 2012).  At that time, the FHFA knew or should have known that the Companies' continued profitability would permit them to remove the valuation allowance against their deferred tax assets.  They did so in 2013, increasing their net

worth by over $84 billion.  The Companies were able to pay the Government Preferred Stock's 10% coupon from available cash and were in a position to begin to provide a financial return to their other investors.  Treasury could have participated in that profit by exercising its warrants for 79.9% of each Company's common stock.

31.     Instead, with the acquiescence of the FHFA, Treasury revised the terms of the Government Preferred Stock to deprive the common shareholders of their right to the residual value of the Companies and to capture the Companies' entire value for itself.  As revised, Treasury's dividend on the Government Preferred Stock, formerly 10% of Treasury's liquidation preference, now amounts to 100% of each Company's net worth minus a capital reserve that starts at $3 billion and declines to zero in 2018.  Announcing the revised terms on August 17, 2012, Treasury described its new dividend as a "Full Income Sweep of All Future Fannie Mae and Freddie Mac Earnings to Benefit Taxpayers for Their Investment," and explained that the revised dividend "will replace the 10 percent dividend payments made to Treasury on its preferred stock investments in Fannie Mae and Freddie Mac with a quarterly sweep of every dollar of profit that each firm earns going forward," and "ensure that "every dollar of earnings that Fannie Mae and Freddie Mac generate will . . . benefit taxpayers."  Press Release, U.S. Dep't of the Treasury, Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012) (emphasis added).  The dividend is payable quarterly, in cash.  If a Company's net worth includes non-cash assets, it must sell non-liquid assets or issue debt to pay the dividend.  The revision also requires the Companies to wind down their mortgage portfolios at an annual rate of 15% rather than 10%, reducing the time for reaching the target amount by four years.  *Id.*

32.     At the time of the revisions in August 2012, the liquidation preference for the

Government Preferred Stock was $189.5 billion, with approximately $117.1 billion attributable to Fannie Mae and approximately $72.3 billion attributable to Freddie Mac.  By then, Fannie Mae had paid dividends equal to approximately 22% of the liquidation preference of its outstanding Government Preferred Stock (more than $25 billion).  Fannie Mae, Quarterly Report (Form 10-Q) at 4 (August 8, 2012).  Freddie Mac had paid dividends to Treasury equal to approximately 28% of the liquidation preference of its outstanding Government Preferred Stock (more than $20 billion).  Freddie Mac, Quarterly Report (Form 10-Q) at 8 (August 7, 2012). Had the dividend not been revised, a continuing obligation to pay the prior, 10% coupon would have resulted in quarterly payments from Fannie Mae and Freddie Mac to Treasury, from January 1, 2013, in approximately the following amounts:

|  | Fannie Mae | Freddie Mac | Combined Total |
|---|---|---|---|
| March 2013 | $2.9 billion | $1.8 billion | $4.7 billion |
| June 2013 | $2.9 billion | $1.8 billion | $4.7 billion |
| September 2013 | $2.9 billion | $1.8 billion | $4.7 billion |
| December 2013 | $2.9 billion | $1.8 billion | $4.7 billion |
| March 2014 | $2.9 billion | $1.8 billion | $4.7 billion |
| June 2014 | $2.9 billion | $1.8 billion | $4.7 billion |
| September 2014 | $2.9 billion | $1.8 billion | $4.7 billion |
| December 2014 | $2.9 billion | $1.8 billion | $4.7 billion |
| March 2015 | $2.9 billion | $1.8 billion | $4.7 billion |
| June 2015 | $2.9 billion | $1.8 billion | $4.7 billion |
| September 2015 | $2.9 billion | $1.8 billion | $4.7 billion |
| Total | $31.9 billion | $19.8 billion | $51.7 billion |

33.    The Net Worth Sweep, in contrast, has captured the Companies' entire earnings, including every dollar of the Companies' record 2013 profits:

|  | Fannie Mae | Freddie Mac | Combined Total |
|---|---|---|---|
| March 2013 | $4.2 billion | $5.8 billion | $10 billion |
| June 2013 | $59.4 billion | $7.0 billion | $66.4 billion |
| September 2013 | $10.2 billion | $4.4 billion | $14.6 billion |
| December 2013 | $8.6 billion | $30.4 billion | $39.0 billion |
| March 2014 | $7.2 billion | $10.4 billion | $17.6 billion |

| June 2014 | $5.7 billion | $4.5 billion | $10.2 billion |
|---|---|---|---|
| September 2014 | $3.7 billion | $1.9 billion | $5.6 billion |
| December 2014 | $4.0 billion | $2.8 billion | $6.8 billion |
| March 2015 | $1.9 billion | $0.9 billion | $2.8 billion |
| June 2015 | $1.8 billion | $0.7 billion | $2.5 billion |
| September 2015 | $4.4 billion | $3.9 billion | $8.3 billion |
| Total | $111.1 billion | $72.7 billion | $183.8 billion |

34. The amount of the Government's windfall is staggering:

- The Companies' collective dividend for June 2013 was $66.4 billion — more than fourteen times the $4.7 billion that Treasury would have received under the original 10% coupon on its Government Preferred Stock.

- From 2013 through September 2015, the Companies will have paid approximately $132.1 billion more in Net Worth Sweep dividend payments than they would have owed on the prior 10% coupon ($183.8 billion versus $51.7 billion).

- From 2008 through September 2015, the Government, as a result of the 10% coupon payments and the Net Worth Sweeps, will have stripped approximately $51.5 billion more from the Companies than it invested in them ($239 billion versus $187.5 billion).

- The Congressional Budget Office estimated in February 2014 that the Net Worth Sweeps in 2014 alone would equal 0.5% of the U.S. Gross Domestic Product for that year. CONGRESSIONAL BUDGET OFFICE, THE BUDGET AND ECONOMIC OUTLOOK: 2014 TO 2024, at 89 (2014).

The FHFA was well aware of how its acquiescence in the Third Amendment affected the Companies under its conservatorship. The FHFA's Inspector General said of the new arrangement that it could result in an "extraordinary payment to Treasury." FHFA OFFICE OF INSPECTOR GENERAL, ANALYSIS OF THE 2012 AMENDMENTS TO THE SENIOR PREFERRED STOCK PURCHASE AGREEMENTS 15 (2013).

35. Critically, "dividend payments do not offset prior Treasury draws." Press Release, Fannie Mae, Fannie Mae Reports Pre-Tax Income of $8.1 Billion for First Quarter 2013 (May 9, 2013), Press Release, Freddie Mac, Freddie Mac Reports Net Income of $4.6 Billion; Comprehensive Income of $7.0 Billion for First Quarter 2013 (May 8, 2013). In other words, no

matter how profitable the Companies become, or how large the dividend payments, all of the $189.5 billion owed on theGovernment Preferred Stock will remain outstanding, and Treasury will continue to make its quarterly sweep of nearly all of the Companies' net worth for as long as they remain in business.  Since Treasury's liquidation preference includes the amount of all unpaid dividends, the Net Worth Sweeps guarantee that, if and when the Companies are liquidated, Treasury will receive all of their remaining net worth.

36.     In its Budget Analysis for fiscal year 2016, the Office of Management and Budget ("OMB") noted that Treasury has invested $187.5 billion in the Companies, and during the period 2008-2014, the Companies paid a total of $225.4 billion in dividends to Treasury.  OMB estimated that the cumulative budgetary impact of revenue from the Government Preferred Stock, from 2015 through fiscal year 2025, will be a net gain to Treasury of over $153.3 billion. In total, OMB estimates that through fiscal year 2025, the Companies will pay Treasury $378.7 billion in dividends, over twice the amount it invested in the Companies, while leaving its principal undiminished *and* retaining a separate right to buy 79.9% of the Companies' equity for a nominal amount. OFFICE OF MANAGEMENT AND BUDGET, FISCAL YEAR 2016, ANALYTICAL PERSPECTIVES OF THE U.S. GOVERNMENT 308 (2015).

## The FHFA's Acquiescence in the Net Worth Sweeps Contravened HERA's Limits on Conservatorship

37.     The FHFA has confirmed repeatedly that its role as conservator is limited, as HERA mandates, to "put[ting] the regulated entity in a sound and solvent condition" and "preserv[ing] and conserv[ing] the assets and property of the regulated entity." §4617(b)(2)(D).

- On September 25, 2008, Director Lockhart testified to Congress that conservatorship "is a statutory process designed to stabilize a troubled institution with the objective of maintaining normal business operations and restoring its safety and soundness," and the FHFA would act as conservator only "until the [Companies] are stabilized."  James B. Lockhart III, Dir., FHFA, Statement Before the Senate Committee on Banking, Housing, and

Urban Affairs (Sept. 25, 2008).

- In congressional testimony in June 2009, Director Lockhart emphasized that "[a]s the conservator, FHFA's most important goal is to preserve the assets of Fannie Mae and Freddie Mac over the conservatorship period. That is our statutory responsibility." James B. Lockhart III, Dir., FHFA, Testimony Before the Fin. Servs. Subcomm. on Capital Mkts., Ins., and Gov't-Sponsored Enters. (June 3, 2009).

- An FHFA Strategic Plan 2009-2014 emphasized that the conservatorship is "designed to stabilize troubled institutions with the objective of maintaining normal business operations and restoring financial safety and soundness," and that the "conservatorship of Fannie Mae and Freddie Mac allows the FHFA to preserve the assets of the [Companies], ensure they focus on their housing mission and are positioned to emerge from conservatorship as financially strong." FHFA, STRATEGIC PLAN 2009-2014, 20-21 (2012).

- In February 2010, the FHFA's new Acting Director, Edward J. DeMarco, told Senate and House leaders that "FHFA is focused on conserving the [Companies'] assets" and "put[ting] [them] in a safe and solvent condition." Letter from Edward J. DeMarco to Christopher Dodd, Chairman, Comm. on Banking, Hous., and Urban Affairs, Barney Frank, Chairman, Comm. on Fin. Servs., Richard C. Shelby, Ranking Minority Member, Comm. on Banking, Hous., and Urban Affairs, and Spencer Bachus, Ranking Minority Member, Comm. on Fin. Servs. (Feb. 2, 2010).

- In a report to Congress in June 2011, the FHFA affirmed its intent to "preserve and conserve each [Company]'s assets and property and restore the [Companies] to a sound financial condition so they could continue to fulfill their statutory mission of promoting liquidity and efficiency in the nation's housing finance markets." FHFA, 2011 REPORT TO CONGRESS, at 1 (2012).

- In November 2011, Acting Director DeMarco told the Senate: "By law, the conservatorships are intended to rehabilitate the [Companies] as private firms." Letter from Edward J. DeMarco, Acting Dir., FHFA, to Senate (Nov. 10, 2011).

38.    HERA, through its implemented rules, makes it clear that a critical aspect of a conservator's role is safeguarding an entity's capital. "FHFA is headed by a Director with general supervisory and regulatory authority over the regulated entities . . . expressly to ensure that the regulated entities operate in a safe and sound manner, including maintaining adequate capital and internal controls." Conservatorship and Receivership, 76 Fed. Reg. at 35,727

(emphasis added).  Clarifying that authority, HERA's implementing rules specifically provide that "<u>a regulated entity shall make no capital distribution while in conservatorship</u>," except in the rare case where such distribution will, *e.g.*, "enhance the ability of the regulated entity to meet the risk-based capital level and the minimum capital level for the regulated entity," "contribute to the long-term financial safety and soundness of the regulated entity," or is "otherwise in the interest of the regulated entity" or "the public interest." 12 C.F.R. §1237.12.  For purposes of §1237.12, "capital distribution" means, in pertinent part, "Any dividend or other distribution in cash or in kind made with respect to any shares of, or other ownership interest in, an Enterprise, except a dividend consisting only of shares of the Enterprise." 12 C.F.R. §1229.13(1).

39.     During rulemaking, the FHFA fiercely defended a ban on capital distributions during conservatorship:

> HERA grants FHFA broad authority as Conservator to manage the conservatorship estate, <u>including the authority to restrict capital distributions that would cause a regulated entity to become undercapitalized</u>.
>
> As one of the <u>primary objectives of conservatorship</u> of a regulated entity would be restoring that regulated entity to a sound and solvent condition, <u>allowing capital distributions to deplete the entity's conservatorship assets would be inconsistent with the agency's statutory goals, as they would result in removing capital at a time when the Conservator is charged with rehabilitating the regulated entity</u>. Under the Safety and Soundness Act and HERA, <u>FHFA has a statutory charge to work to restore a regulated entity in conservatorship to a sound and solvent condition</u>, and to take any action authorized by this section, which FHFA determines to be in the best interests of the regulated entity or FHFA.

Conservatorship and Receivership, 76 Fed. Reg. at 35,727 (emphasis added).

40.     Fannie Mae has repeatedly warned about the threats to its existence from Treasury's steady depletion of its capital.  The Company identified the Net Worth Sweeps as posing a "specific risk to [its] business" by prohibiting it from "build[ing] capital reserves." Fannie Mae, Universal Debt Facility, Offering Circular, at 11 (May 14, 2013).  Fannie Mae blamed the Net Worth Sweeps for its inability to pass an April 2014 stress test mandated by the

Dodd-Frank Wall Street Reform and Consumer Protection Act.  Statement by Kelli Parsons, Senior Vice President and Chief Communications Officer, on Stress Test Results, Fannie Mae (Apr. 30, 2014).  Under that test's "severely adverse" scenario, Fannie Mae, which at that point had enjoyed two years of robust and increasing profitability, required a capital infusion of $34 billion to $98 billion.  *Id.*  Fannie Mae announced that "[t]he results of the severely adverse scenario are not surprising given the [C]ompany's limited capital," depleted by Net Worth Sweeps under which Fannie Mae's "ability to accumulate capital is severely restricted and the company is required to reduce its capital on a yearly basis. . . . Fannie Mae is <u>not permitted</u> to retain capital to withstand a sudden, unexpected economic shock of the magnitude required by the stress test."  *Id.* (emphasis added).

41.     The FHFA's critical role as a regulator and guardian of an entity's capital is apparent in HERA's list of "grounds for appointing conservator."  12 U.S.C. §4617(a)(3)(A).  Eight out of twelve involve dissipating or inadequate capital.  *See id.* §§4617(a)(3)(A) ("[a]ssets insufficient for obligations"); 4617(a)(3)(B) ("substantial dissipation of assets"); 4617(a)(3)(C) ("unsound condition to transact business");  4617(a)(3)(F) ("[i]nability to meet obligations"); 4617(a)(3)(G) ("losses that will deplete all or substantially all of its capital"); 4617(a)(3)(H) ("practice or condition that is likely to . . . insolvency or substantial dissipation of assets or earnings");     4617(a)(3)(J)     ("undercapitalization");     4617(a)(3)(K)     ("[c]ritical undercapitalization").   Strikingly, every one of those threats to an entity's survival is an inevitable and deliberate <u>goal</u> of the Net Worth Sweeps implemented by the Companies' supposed conservator.  The FHFA's acquiescence in the Net Worth Sweeps was the antithesis of conservation, and plainly contravened the agency's authority — and mandate — under HERA.

## The Net Worth Sweeps Are Irreconcilable with
## HERA's Distinction between Conservatorship and Receivership

42.     The FHFA does not deny that the Net Worth Sweeps deprive the Companies of funds to rebuild their capital reserves. FHFA, 2012 REPORT TO CONGRESS, at 13 (June 13, 2013). Both the FHFA and Treasury candidly admit that depletion of the Companies' capital, as a prelude to liquidation, is precisely what the Net Worth Sweeps were designed to achieve.  On August 17, 2012, Treasury disclosed them as a measure that would "help <u>expedite the wind down</u> of Fannie Mae and Freddie Mac, make sure that <u>every dollar of earnings each firm generates is used to benefit taxpayers</u>, and support the continued flow of mortgage credit during a responsible transition to a reformed housing finance market." Press Release, U.S. Dep't of the Treasury, Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012) (emphasis added).  Treasury and the FHFA have repeated this message numerous times:

- As early as February 2011, a Treasury White Paper advocated using a combination of "policy levers . . . [to] wind down Fannie Mae and Freddie Mac."  It stated that "[t]he Administration will work with FHFA to determine the best way to responsibly <u>reduce Fannie Mae and Freddie Mac's role in the market and ultimately wind down both institutions</u>." U.S. DEP'T OF THE TREASURY, REFORMING AMERICA'S HOUSING FINANCE MARKET: A REPORT TO CONGRESS, at 2 (2011) (emphasis added).

- In its August 17, 2012, announcement, Treasury called the Government Preferred Stock's new dividend a "[f]ull income sweep" of "every dollar of profit that [the] firm earns going forward," and said it will fulfill the "commitment made in the Administration's 2011 White Paper <u>that [Fannie Mae and Freddie Mac] will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form</u>." Press Release, U.S. Dep't of the Treasury, Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012) (emphasis added).

- Acting Director DeMarco said the Third Amendment reflects the agency's goal of "<u>gradually contracting</u> [the Companies'] operations." Edward J. DeMarco, Acting Dir., FHFA, *Statement on Changes to Fannie Mae and Freddie Mac Preferred Stock Purchase Agreements* (emphasis added).

Edward J. DeMarco, Acting Dir., FHFA, Statement on Changes to Fannie Mae and Freddie Mac Preferred Stock Purchase Agreements (Aug. 17, 2012).

• DeMarco also testified that "replacing the 10 percent dividend with a net worth sweep, reinforce[s] the notion that the [Companies] will not be building capital as a potential step to regaining their former corporate status." Edward J. DeMarco, Acting Dir., FHFA, Statement Before the U.S. Senate Comm. on Banking, Housing and Urban Affairs, at 3 (Apr. 18, 2013) (emphasis added).

• In 2012, the FHFA reported to Congress that it had begun "prioritizing [its] actions to move the housing industry to a new state, one without Fannie Mae and Freddie Mac," and the Net Worth Sweep "ensures all the [Companies'] earnings are used to benefit taxpayers" and "reinforces the fact that the [Companies] will not be building capital." FHFA, 2012, REPORT TO CONGRESS, at 1, 13 (June 13, 2013) (emphasis added).

• In a January 2014 speech, Treasury Secretary's Counselor for Housing Finance Policy, Michael Stegman, characterized the FHFA Director's "broad responsibilit[y]" as "wind[ing] down [Fannie Mae and Freddie Mac]." Michael Stegman, Remarks of Counselor to the Secretary for Housing Finance Before the ABS Vegas 2014 Conference (Jan. 22, 2014).

• In March 2014, Treasury Secretary Jacob J. Lew testified before Congress that Treasury "ha[s] had a very clear policy on Fannie and Freddie, which is that we're winding them down." Sen. Pat Toomey, *Sen. Toomey Questions Secretary Lew at Budget Committee Hearing*, (Mar. 12, 2014), YOUTUBE, http://ww.youtube.com/watch?v=6QLPG_8K4bM (3:03-5:02).

• The 2013 and 2014 annual reports of the Financial Stability Oversight Council — over which Secretary Lew presides as Chairman and whose voting members include all significant administrative bodies on U.S. financial policy — express joint views from Treasury and FHFA to "wind-down" Fannie Mae and Freddie Mac. Fin. Stability Oversight Council, 2013 Annual Report (2013); Fin. Stability Oversight Council, 2014 Annual Report (2014).

43. Nothing in HERA provides a shred of authority for the FHFA or the Treasury to pursue that goal with respect to an entity in conservatorship. Not only is liquidation antithetical to a conservator's exclusive mandate to "preserve and conserve the assets and property of the regulated entity," it is also a power that is reserved exclusively to a "receiver" who may be appointed only in clearly defined and documented circumstances. 12 U.S.C. §4617(b)(2)(B)(iv). Once appointed, the "receiver" has no choice but to liquidate and may do so only as prescribed in

minute detail by the statute.

44.     HERA does contemplate that the FHFA "<u>may</u> . . . be appointed . . . receiver for the purpose of . . . winding up the affairs of a regulated entity." 12 U.S.C. §4617(a)(2) (emphasis added).   However, when the agency has been appointed to act as a conservator, there is no statutory basis for power or authority to wind down an entity, liquidate it, or take any other action inconsistent with "carry[ing] on the business of the regulated entity and preserv[ing] and conserv[ing] the assets and property of the regulated entity" *id.* §4617(b)(2)(D).   The circumstances under which the FHFA may be appointed as "conservator <u>or</u> receiver," *id.* §4617(a) (emphasis added), are statutory, as are the specific powers appurtenant to each role, *id.* §4617(b)-(d), (i), (k).

45.     Moreover, even though receivership can be "discretionary," the "discretion" belongs entirely to the Director, and it ends with his determination to appoint the agency to one or the other of its two possible roles.   The statute does not permit the agency to assume both roles simultaneously or even alternately:   "<u>The appointment of the Agency as receiver</u> of a regulated entity under this section <u>shall immediately terminate any conservatorship</u> established for the regulated entity under this [title]."   *Id.* §4617(a)(4)(D) ("Receivership terminates conservatorship") (emphasis added).   Nor is there any ambiguity about the Director's choice.   An appointment of a "receiver" must be made in writing.   *Id.* §§4617(a)(4)(A)-(C).

46.     Although certain general powers to operate and manage an entity are granted to "conservator or receiver," *e.g.*, *id.* §4617(b)(2)(A)-(B), "liquidation" falls exclusively within the agency's "powers as receiver." *Id.* §4617(b)(2)(E).   Moreover, once the agency is appointed receiver and assigned that power, it must use it:   "In <u>any case</u> in which the Agency is <u>acting as receiver</u>, the Agency <u>shall place</u> the regulated entity in <u>liquidation</u> and proceed to realize upon

the assets of the regulated entity." *Id.* (emphasis added).   Sections detailing procedures for liquidation, claims determination, and transfer of a failed entity's assets to a limited-life regulated entity in each instance clearly identify the agency as acting in its role as "receiver." *See, e.g.*, §§4617(b)(2)E), (b)(2)(K), (b)(3)-(9), (c), (i).

47.   The rules implementing HERA underscore the bright line between the FHFA's roles as conservator and receiver.   "The Agency, <u>as receiver</u>, <u>shall place the regulated entity in liquidation</u>, employing the additional powers expressed in 12 U.S.C. §4617(b)(2)(E)."   12 C.F.R. §1237.3(b) (emphasis added).   In publishing the final version of that rule, the FHFA explained that the only possible overlap between the powers of receiver and conservator was with respect to continuing operations, and that overlap exists only because a failed entity's business does not necessarily come to an abrupt halt.   A conservator's role, in contrast, could never require powers related to liquidation and winding up:

> The <u>ultimate responsibility of FHFA as receiver</u> is to resolve and liquidate the existing entity. A <u>conservator's goal</u> is to continue the operations of a regulated entity, rehabilitate it and return it to a safe, sound and solvent condition. While operating an entity in conservatorship, continuation of the mission of the institution and fostering liquid, efficient, competitive and resilient national housing markets may be in the regulated entity's best interest, and are consistent with the Safety and Soundness Act's provisions governing operating entities. <u>These activities of a conservator may not be aligned with the ultimate duty of a receiver, although in the process of finally resolving a regulated entity FHFA will need to strike the proper balance</u> between continuing certain operations pending liquidation and terminating other operations. <u>This balance may include temporarily operating in support of the failed institution's mission</u>.

Conservatorship and Receivership, 76 Fed. Reg. at 35,730 (emphasis added).

48.   There is no ambiguity about the FHFA's appointment as conservator to the Companies here.   On September 7, 2008, the FHFA publicly announced that "FHFA will act as the <u>conservator</u> to operate the Enterprises <u>until they are stabilized</u>."   James B. Lockhart, Dir., FHFA, Statement of FHFA Director James B. Lockhart at News Conference Announcing

Conservatorship of Fannie Mae and Freddie Mac (Sept. 7, 2008) (emphasis added).  The FHFA's statement explained that "conservatorship" was "a statutory process designed to stabilize a troubled institution with the objective of <u>returning the entities to normal business operations</u>. FHFA will act as the conservator to operate the Enterprises until they are stabilized." *Id.* (emphasis added). The FHFA also issued a Fact Sheet indicating that, "[u]pon the [FHFA] Director's determination that the Conservator's plan to <u>restore the Company to a safe and solvent condition</u> has been completed successfully, the Director will issue an order terminating the conservatorship." FHFA, Fact Sheet, at 2 (Sept. 7, 2008) (emphasis added).  The Fact Sheet emphasized that "[u]nder a conservatorship, the Company is not liquidated. . . . <u>The Conservator cannot make a determination to liquidate the Company</u>. . . . Receivership is a statutory process for the liquidation of [the Company].").  *Id.* at 3. *See also* News Release, FHFA, *A Strategic Plan for Enterprise Conservatorships: The Next Chapter in a Story that Needs an Ending*, at 9 (Feb. 21, 2012) (asserting that "[w]ithout action by Congress, FHFA must continue to look to the existing statutory provisions that guide <u>the conservatorships</u>") (emphasis added).

49.     Nor are there any conceivable grounds for receivership over the Companies. HERA's grounds for "Mandatory Receivership" are unambiguous:  "(i) the assets of the regulated entity are, and during the preceding 60 calendar days have been, less than the obligations of the regulated entity to its creditors and others; or (ii) the regulated entity is not, and during the preceding 60 calendar days has not been, generally paying the debts of the regulated entity (other than debts that are the subject of a bona fide dispute) as such debts become due."  12 U.S.C. §4617(a)(4).  The "[g]rounds for discretionary appointment of [a] . . . receiver" are broader, *id.* §4617(a)(3), but if they fit the Companies' circumstances, that was a choice for the agency to make, and it did not.

50.     The FHFA's commitment of the Companies to Treasury's terms for its investment in them devolved from HERA by "operation of law," which vested the conservator, "immediately" upon appointment, with "all rights, titles, powers, and privileges of the regulated entity."  *Id.* §4617(b)(2)(A).  However, the agency's application of that law to effect a *de facto* liquidation of the Companies under its conservatorship is a misapplication of that law and an abuse of the authority it conferred.

**The Net Worth Sweeps Contravene HERA Limits on
Treasury Purchase of Securities**

51.     HERA provided the Secretary of Treasury with authority to "purchase any obligations and other securities issued by the [Companies]" and "determine" those securities' "terms and conditions [and] . . . amounts" only through December 31, 2009.  12 U.S.C. §§1455(*l*)(1)(A), (*l*)(5); 1719(g)(1)(A), (g)(5).  Treasury's replacement of the 10% coupon on its Government Preferred Securities with Net Worth Sweep dividends, and revision of other terms of those securities, in August 2012, was tardy and unauthorized.

52.     Moreover, "[i]n connection with <u>any</u> use of [the] authority" granted to Treasury by HERA, the Secretary was required to make the emergency determination that such action was "necessary to . . . provide stability to the financial markets; prevent disruptions in the availability of mortgage finance; and protect the taxpayer."  12 U.S.C. §§1455(l)(1)(B), 1719(g)(1)(B) (emphasis added).  In making that determination, the Secretary was also required to consider factors including: "(iii) [t]he [Companies'] plan[s] for the orderly resumption of private market funding or capital market access; (iv) [t]he probability of the [Companies'] fulfilling the terms of any such obligation or other security, including repayment; [and] (v) [t]he need to maintain the [Companies'] status as [] private shareholder-owned compan[ies]."  *Id.* §§1455(l)(1)(C), 1719(g)(1)(C).

26

53.     The Secretary plainly should not have made any emergency determination in August 2012, when the housing market was rebounding, the Companies' profits were soaring, and the Companies were on the brink of adjusting their balance sheets to begin reflecting enormous write-ups of assets devalued by the FHFA's erroneous projections.

54.     Moreover, Treasury's exploitation of the Net Worth Sweeps to prevent Plaintiffs and all of the Companies' other private investors from obtaining even one dollar of return on their investment was unauthorized and unlawful under HERA.  Nothing in its grant of temporary authority to Treasury encompassed any power to abrogate investors' rights with respect to the Companies permanently.  To the contrary, only the FHFA in its role as receiver can cause investor's rights to "terminate," *id.* §4617(b)(2)(K)(i), and those provisions afford the investor extensive procedural protections, including judicial review — but none of those protections has been accorded to the Companies or their private owners.

55.     Secretary Paulson himself acknowledged, on September 7, 2008, that "conservatorship does not eliminate the common stock."  Henry M. Paulson, Jr., Secretary, U.S. Dep't of the Treasury, Statement on Treasury and Federal Housing Finance Agency Action to Protect Financial Markets and Taxpayers (Sept. 7, 2008).  Director Lockhart also stated publicly that during conservatorship, the Companies' stock would remain outstanding and continue to trade, and "[s]tockholders w[ould] continue to retain all rights in the stock's financial worth." FHFA, Fact Sheet, at 3 (Sept. 7, 2008).

56.     To the extent that the Net Worth Sweeps terminated any of Plaintiffs' rights in the Companies' stock, or impaired that stock's value to Plaintiffs, the revised dividends were unauthorized and unlawful.

**The Net Worth Sweeps Are Takings of Plaintiffs' Vested
Property Rights without Just Compensation**

57.     Plaintiffs' ownership of common stock in the Companies vests them with certain property rights, as specified in the Companies' charters, by-laws, prospectuses, registration statements, and applicable federal and state law.  Those rights include, without limitation, the right to participate in the Companies' future income stream and the right to the residual value of the Companies.

58.     These rights survived the imposition of conservatorship over the Companies in 2008.  As explained by the FHFA at the outset of the conservatorship, the equity holders "continue[d] to retain all rights in the stock's financial worth."  *Id.*

59.     Plaintiffs' interests in their common stock, including the rights described above, are cognizable property rights protected by the Fifth Amendment.

60.     Indeed, just as equity holders have a constitutionally protected "direct and cognizable property interest in a potential liquidation surplus" from a Government-administered receivership, *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1296 (Fed. Cir. 1999), they likewise have a constitutionally protected direct and cognizable property interest in the potential residual value of an entity in a Government conservatorship.

61.     As common shareholders in the Companies, Plaintiffs had reasonable investment-backed expectations that these property rights would be preserved.  These property rights were essential features of the Companies' common stock and were protected by law, including applicable federal and state law to which the Companies are subject.

62.     The Net Worth Sweeps deny Plaintiffs all economically beneficial or productive use of their vested property rights by wiping out any future income stream and residual value and making it impossible for Plaintiffs to realize the value of their ownership interest in the

Companies.  Plaintiffs have suffered concrete harm because the Net Worth Sweeps ensure that the Companies will never be able to emerge from conservatorship and resume normal business operations, and they ensure that Treasury will maintain its approximately $189.5 billion total liquidation preference, which will capture any residual value of the Companies.

63.    While the Companies' common shares continue to trade on the over-the-counter market, the Net Worth Sweeps effectively destroyed all of their intrinsic value.  The common shares trade for a positive market value due solely to market perception that the Net Worth Sweeps are unlawful and/or constitute a taking without just compensation, and will therefore be invalidated.

64.    By design, the Net Worth Sweeps channel the Companies' profits to Treasury, for the express benefit of the Government, at the expense of the common shareholders of the Companies.  It thereby takes that property for public use, and Plaintiffs are entitled to just compensation.

### The Net Worth Sweeps Are Takings of the Companies' Vested Property Rights without Just Compensation

65.    Like any private company, Fannie Mae and Freddie Mac have vested property rights in their quarterly profits.  These rights include, without limitation, the right to accumulate capital, invest and/or reinvest in their business, retain profits, or distribute dividends to shareholders.

66.    Since the Housing and Urban Development Act of 1968, Fannie Mae has been a privately-owned, for-profit corporation.  Prior to 2007, Fannie Mae was consistently profitable and had not reported an annual loss since 1985.  FHFA, 2014 REPORT TO CONGRESS, at 79 (2015).

67.    Since the Financial Institutions Reform, Recovery and Enforcement Act of 1989

("FIRREA"), Freddie Mac has been a privately-owned, for-profit corporation.  Prior to 2006, Freddie Mac was consistently profitable and had not reported an annual loss since it was privatized by the FIRREA.  *Id.* at 96.

68.     The Companies' vested property rights survived the imposition of the FHFA's conservatorship in 2008, the limited role of which was to "preserve and conserve the [Companies'] assets and property" and restore the Companies to a "sound and solvent condition" "with the objective of returning the [Companies] to normal business operations."   12 U.S.C. §§4617(b)(2)(B)(iv), 4617(b)(2)(D)(i); James B. Lockhart, Dir., FHFA, Statement of FHFA Director James B. Lockhart at News Conference Announcing Conservatorship of Fannie Mae and Freddie Mac (Sept. 7, 2008).  Instead of attempting to restore the Companies, however, the Government exceeded its authority and permanently confiscated the Companies' entire economic value for public use.

69.     The Companies' interest in their quarterly profits is a cognizable property interest protected by the Fifth Amendment.

70.     Fannie Mae and Freddie Mac, since their privatization in 1968 and 1989, respectively, had reasonable investment-backed expectations in their quarterly profits and had reasonable investment-backed expectations that these profits would not be expropriated in their entirety by Treasury in perpetuity and without consideration.

71.     Instead of "preserv[ing] and "conserv[ing]" the Companies' assets, the Net Worth Sweeps divert to Treasury every dollar of profit earned by the Companies for the Treasury's own use.

72.     By design, the Net Worth Sweeps deprive the Companies of their entire economic value and channel that value directly to Treasury for the express benefit of the Government.

73.     As of September 2015, the Government has collected over $111 billion from Fannie Mae, and over $72 billion from Freddie Mac under the Net Worth Sweeps without providing any compensation whatsoever.

74.     Because the Net Worth Sweeps take the Companies' property for public use, the Companies are entitled to just compensation.

## Derivative Allegations

## FANNIE MAE

75.     Plaintiff Rafter and the Rattien Plaintiffs bring Claims II and III as shareholder derivative claims pursuant to Rule of the Court of Federal Claims 23.1.

76.     These Plaintiffs bring these claims derivatively in the right and for the benefit of Fannie Mae to redress injuries suffered, and to be suffered, by Fannie Mae as a direct result of the violations described herein. Fannie Mae is named as a nominal defendant solely in a derivative capacity.

77.     These Plaintiffs will adequately and fairly represent the interests of Fannie Mae and its shareholders in enforcing and prosecuting its rights.

78.     Pursuant to Rule of the Court of Federal Claims 23.1(b)(2), this is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

79.     These Plaintiffs were shareholders of Fannie Mae at the time of the actions complained of herein and remain shareholders.

80.     To the extent that demand on Fannie Mae's board of directors would otherwise be required to maintain a derivative claim on Fannie Mae's behalf, such demand would be futile and is excused because:  (a) Fannie Mae's directors, through the Company's Form 10-K filings with the Securities and Exchange Commission, have disclaimed any fiduciary duty or obligation to anyone other than the FHFA; (b) Fannie Mae's directors, through the Company's Form 10-K

filings, have acknowledged that the Company is not managed for the benefit of its common shareholders and that they will not "consider the interests of the company [or] the holders of our equity or debt securities . . . unless specifically directed to do so by the conservator [FHFA]"; and (c) FHFA purports to have assumed all of the powers of the board of directors and has not authorized the board of directors to entertain this claim. *E.g.*, Fannie Mae, Annual Report (Form 10-K), at 1 (Feb. 20, 2015); Fannie Mae, Annual Report (Form 10-K), at 1 (Feb. 21, 2014); Fannie Mae, Annual Report (Form 10-K), at 1 (Apr. 2, 2013); Fannie Mae, Annual Report (Form 10-K), at 1 (Feb. 29, 2012).

81.     To the extent that demand on the FHFA would otherwise be required to maintain a derivative claim on Fannie Mae's behalf, such demand would be futile and is excused.  It is inconceivable that the FHFA, an agency of the United States Government, would sue the Government, particularly given that the FHFA's own conduct in acquiescing in and implementing the Net Worth Sweeps is directly at issue in this action.  The FHFA cannot reasonably be expected to initiate litigation challenging its own conduct or that of the Government, in which it has acquiesced, as unlawful.

82.     The FHFA — in its capacity as conservator of Fannie Mae — has acted at the direction, behest, or under the control of Treasury with respect to the Net Worth Sweeps. Treasury is the direct beneficiary of the Net Worth Sweeps, pocketing billions of dollars at the expense of fellow shareholders as a result of the conduct challenged herein.  The FHFA's and Treasury's overwhelming conflicts of interest render the FHFA incapable of exercising independent judgment.

83.     Demand on the FHFA would also be futile because the Net Worth Sweeps served no legitimate business purpose of Fannie Mae and were instead designed to benefit only the

Government.  That agreement thus was not the product of a valid exercise of business judgment.

84.     Plaintiffs aver that they reasonably believe that all factual contentions made on information and belief will likely have evidentiary support after a reasonable opportunity for further investigation and discovery.

## CAUSES OF ACTION

## CLAIM I

## Just Compensation under the Fifth Amendment for the Taking of Private Property for Public Use

### (Direct Claim by All Plaintiffs)

85.     Plaintiffs re-allege and incorporate by reference all of the allegations contained in the preceding paragraphs.

86.     The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

87.     In implementing the Net Worth Sweeps, the Government acted, by its own admission, to take "every dollar of earnings each firm generates . . . to benefit taxpayers."  Two federal agencies — the FHFA and Treasury — have implemented, and continue to implement, Net Worth Sweeps that appropriate *all* present and future earnings of the Companies to Treasury in the form of quarterly dividends.  The Net Worth Sweep dividends leave the Companies with no means of redeeming the Government Preferred Stock, and cannot themselves be applied to reduce the principal amount of the Companies' debt.  Any unpaid dividends are added to that amount.  Consequently, Treasury's liquidation preference subsumes the entire present and future net worth of the Companies, eliminating the value of stock held by any other investor.

88.     Plaintiffs have a cognizable property interest in their common stock and

reasonable, investment-backed expectations in their right to participate in the Companies' future earnings.  Plaintiffs also had reasonable, investment-backed expectations in a proportionate share of any residual value in the Companies should they be dissolved or liquidated.

89.     The United States, through the Net Worth Sweeps, has deprived Plaintiffs of all intrinsic economic or beneficial value of these property interests and/or destroyed these reasonable investment-backed expectations, and has expropriated the value of Plaintiffs' property for its own use, without paying just compensation.

90.     As a result of the Net Worth Sweeps, Plaintiffs have been deprived of the current and future value of their common stock in the Companies.  Plaintiffs have therefore suffered a categorical taking and/or regulatory taking without just compensation as a result of the Net Worth Agreements.

91.     Plaintiffs are entitled to just compensation for the Government's taking of their property.

## CLAIM II

### Just Compensation under the Fifth Amendment
### for the Taking of Private Property for Public Use

**(Derivative Claim on Behalf of Fannie Mae
by Plaintiff Rafter and the Rattien Plaintiffs)**

92.     Plaintiffs re-allege and incorporate by reference all of the allegations contained in the preceding paragraphs.

93.     Fannie Mae has a cognizable property interest and reasonable investment-backed expectations in its quarterly profits.

94.     The United States, through the Net Worth Sweeps, has confiscated all such property interest for its own use without paying any consideration.

95.     Fannie Mae has therefore suffered a categorical taking and/or a regulatory taking

without just compensation.

96.    Fannie Mae is entitled to just compensation for the Government's taking of its property.

## CLAIM III

### Illegal Exaction

**(Derivative Claim on Behalf of Fannie Mae
by Plaintiff Rafter and the Rattien Plaintiffs)**

97.    Plaintiffs re-allege and incorporate by reference all allegations contained in the preceding paragraphs.

98.    Treasury and its agents demanded cash payments of Net Worth Sweep dividends on Government Preferred Stock created under HERA, 12 U.S.C. §1719(g), and issued by Fannie Mae.  The FHFA, claiming succession to all rights, titles, powers, and privileges of Fannie Mae by operation of law under §4617(b)(2), and the FHFA's agents acting on its behalf, acquiesced in the terms of the Net Worth Sweeps, and gave Fannie Mae's money to Treasury in response to its demand.

99.    Treasury's revision of the dividend on Government Preferred Stock, under the ostensible mandate of 12 U.S.C. §1719(g), and the FHFA's invocation of §4617 in paying that dividend, exceeded authority granted by those statutes and misapplied them.

100.    Without budgetary, regulatory, statutory, or other authority, the Government and its agents acting on its behalf exacted cash payments from Fannie Mae for improper and unauthorized Net Worth Sweep dividends of over $106 billion, and, by September 2015, will have exacted over $111 billion.

101.    The improper conduct described above constitutes illegal exaction of Fannie Mae's money without due process.

102.    Fannie Mae has suffered injury as a direct and proximate result of such illegal exaction, including but not limited to monetary damage.  As a result of the conduct alleged herein, the United States is liable to Fannie Mae, and Fannie Mae is entitled to relief.

### CLAIM IV

### Breach of Contract

### Fannie Mae's Charter, By-Laws and the Delaware General Corporations Law

### (Direct Claim by All Plaintiffs)

103.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in the preceding paragraphs.

104.    Fannie Mae's Charter (defined below), its by-laws and the Delaware General Corporation Law ("**DGCL**") form a contract (the "**Fannie Mae Contract**") to which the Government became party when the FHFA, as conservator of Fannie Mae, succeeded to all rights, titles, powers and privileges of Fannie Mae and its shareholders, officers or directors, *see* 12 U.S.C. §4617(b)(2)(A)(i), and was otherwise authorized to act on behalf of Fannie Mae and its shareholders, officers and directors, *see, e.g.*, *id.* §4617(b)(2)(B)-(D), (G)-(J).  The Fannie Mae Contract obliges the Government, through the FHFA as conservator of Fannie Mae, to operate in a manner that does not extinguish the rights of Fannie Mae's private shareholders, as recognized in Fannie Mae's Charter, and to refrain from actions that violate applicable Delaware laws.  The Government breached the contract by agreeing to replace the Government Preferred Stock's original dividend with the Net Worth Sweep dividends, which capture Fannie Mae's entire value for the Government by appropriating all of Fannie Mae's net worth and eliminating the residual value that belonged to the common shareholders.

105.    The Fannie Mae Contract is a product of both federal and Delaware law.  Fannie Mae's Charter Act, 12 U.S.C. §1716, *et seq.* ("**Fannie Mae's Charter**"), including the powers

and privileges set forth therein, is a contract between and among the Government, as the granter of the charter, Fannie Mae and Fannie Mae's shareholders as a matter of federal law.

106.    In addition, Fannie Mae's Charter, the Fannie Mae Bylaws and the DGCL form a binding and enforceable contract among Fannie Mae, its directors, officers and shareholders under Delaware law, to the extent that contract is not inconsistent with Fannie Mae's Charter and other federal law, rules and regulations.  Pursuant to Section 1710.10 of the OFHEO corporate governance regulation, 12 C.F.R. §1710.1, *et seq*., to the extent not inconsistent with Fannie Mae's Charter, other federal laws, rules and regulations, and the "safe and sound" operations of Fannie Mae, Fannie Mae must follow the corporate governance practices and procedures of the law of the jurisdiction in which the principal office of Fannie Mae is located; the DGCL; or the Revised Model Business Corporation Act.  Section 1.05 of the Fannie Mae Bylaws provides that, to the extent not inconsistent with Fannie Mae's Charter and other federal laws, rules and regulations, Fannie Mae "has elected to follow the applicable corporate governance practices and procedures of the Delaware General Corporation Law, as the same may be amended from time to time."  Under Delaware law, the DGCL, a corporation's charter, and its bylaws together form a contract among the corporation, its directors, officers and shareholders.  Thus — to the extent not inconsistent with Fannie Mae's Charter and other federal law, rules and regulations — Fannie Mae's Charter, the Fannie Mae Bylaws and the DGCL form the Fannie Mae Contract, a binding and enforceable contract among Fannie Mae, its directors, officers and shareholders.

107.    Pursuant to 12 U.S.C. §4617(b)(2), the FHFA, as conservator of Fannie Mae, succeeded to all rights, titles, powers and privileges of Fannie Mae and its shareholders, officers and directors, and became otherwise authorized to act on behalf of Fannie Mae and its shareholders, officers and directors, and, thus, was bound by, Fannie Mae's Charter and the

Fannie Mae Contract.

108.    Fannie Mae's Charter provides that Fannie Mae "shall have common stock," 12 U.S.C. §1718(a), contemplates that such "shares of common stock" will be "purchas[ed]," "h[e]ld," and "dispose[d] of . . . subject to the provisions of [Fannie Mae's Charter]," *id*. §1717(d), and expressly recognizes Fannie Mae's status as a "private shareholder-owned company." *Id*. §1719(g)(1)(C)(v).

109.    The DGCL recognizes property rights associated with common stock.  *See, e.g.*, DGCL §159 (common stock "shall be deemed personal property").  DGCL §151(c) expressly protects one of these rights, the common shareholders' right to participate in any net profits or residual value by providing that preferred shareholders "shall be entitled to receive dividends <u>at such rates</u>" (emphasis added) as stated and which "shall be . . . payable in preference to, or in such relation to, the dividends payable on any other class" of stock, so that "[w]hen dividends upon the preferred . . . stock, if any, to the extent of the preference to which such stock are entitled, shall have been paid . . . a dividend on the remaining class or classes or series of stock may then be paid out of the remaining assets of the corporation available for dividends."  One of the most material rights incident to common stock ownership, in addition to the right to participate in net profits, is the right of common shareholders to the residual value of the corporation.  *See, e.g.*, *Salt Dome Oil Corp. v. Schenck*, 41 A.2d 583, 588 (Del. Sup. Ct. 1945) ("The right . . . to participate in dividends and profits and in the net assets of the corporation on dissolution are the most material rights incident to stock ownership.").

110.    The property rights associated with private ownership of Fannie Mae's common stock are explicitly recognized by Fannie Mae's Charter.  The property rights associated with private ownership of common stock under the DGCL are consistent with Fannie Mae's Charter

and are not inconsistent with any other Federal law, rules and regulations (including HERA). These property rights comprise binding and enforceable provisions of the Fannie Mae Contract.

111.    The Net Worth Sweep dividends extinguish the right and ability of the common shareholders to participate in any net profits or residual value of Fannie Mae.  By appropriating all of Fannie Mae's profits and all of its net worth, less a capital reserve that declines to zero in 2018, the common shareholders are deprived of any and all actual or potential value of the shares they own in perpetuity, in violation of the Fannie Mae Contract.

112.    The Net Worth Sweeps do not constitute "dividends *at such rates*," as required by Section 151(c).  The Net Worth Sweeps set no rate and replace the 10% fixed dividend rate on the Government Preferred Stock with a perpetual, unlimited requirement that Fannie Mae pay its entire profit to Treasury without regard to the capital attributable to Treasury or other shareholders, or the common shareholders' right to a return in the amount of Fannie Mae's residual value.

113.    The Net Worth Sweeps also violate Section 151(c)'s requirement that dividends be "payable in preference to, or in . . . relation to, the dividends payable on any other class or classes or of any other series of stock[.]."  Because no earnings remain available to pay any dividends to shareholders other than Treasury after payment of the Net Worth Sweep dividends, the Government Preferred Stock does not carry a permissible dividend "preference," nor are the Net Worth Sweep dividends "in . . . relation to" dividends payable to any other shareholders.

114.    The DGCL does not permit a corporation to have preferred stock if the corporation does not also have common stock entitled to receive the residual value that remains after the preferred stock's preference has been paid.  Preferred stock that entitles its holder to receive all the value of the corporation, leaving no residuum for common shareholders under any

set of circumstances, is unlawful.

115.    The Net Worth Sweep dividends on the Government Preferred Stock make it impossible for Fannie Mae to pay dividends or other distributions in respect of its common shares.  Because the Net Worth Sweeps entitle the Government to Fannie Mae's entire value, they violate the DGCL, which is part of the Fannie Mae Contract.

116.    The Government breached the Fannie Mae Contract by entering into the Third Amendment and agreeing to replace the Government Preferred Stock's original dividend with the Net Worth Sweep dividends, which entirely extinguish Fannie Mae's net and residual value by giving the Government Fannie Mae's entire net worth by 2018, in violation of the common shareholders' contractual rights.

117.    As a result of the Government's breach of the Fannie Mae Contract, Plaintiffs, as shareholders in Fannie Mae, have suffered damages in an amount to be determined at trial.

## CLAIM V

### Breach of Contract

### Covenant of Good Faith and Fair Dealing Implied in Fannie Mae's Charter

**(Direct Claim by All Plaintiffs)**

118.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in the preceding paragraphs.

119.    As alleged in Claim IV, above, Fannie Mae's Charter is a contract between and among the Government, as the granter of the charter, Fannie Mae, and Fannie Mae's shareholders.  When the FHFA, as conservator of Fannie Mae, succeeded to all rights, titles, powers and privileges of Fannie Mae and its shareholders, officers or directors, *see* 12 U.S.C. §4617(b)(2)(A)(i), and was otherwise authorized to act on behalf of Fannie Mae and its shareholders, officers and directors, *see, e.g.*, *id*. §4617(b)(2)(B)-(D), (G)-(J), the Government

also succeeded to Fannie Mae's position as a party to the contract that is Fannie Mae's Charter.

120.    As further alleged in ¶108, above, Fannie Mae's Charter provides that Fannie Mae "shall have common stock" and expressly recognizes Fannie Mae's status as a "private shareholder-owned company."  12 U.S.C. §1718(a), §1719(g)(1)(C)(v).  Under general corporate law principles, a corporation's common shareholders have, collectively, a right to the corporation's residual value through a right to participate in the corporation's residual earnings and a right, upon dissolution, to share in any residual proceeds from liquidation of the assets. Thus, under Fannie Mae's Charter, the Government agreed that common shareholders of Fannie Mae would have common stock that is vested with a right to the residual value of Fannie Mae, including to share in Fannie Mae's earnings.

121.    Fannie Mae has issued common stock.

122.    Because Fannie Mae's Charter is a contract, it imposes on the Government an implied covenant of good faith and fair dealing in its performance and enforcement of the contract.  The covenant of good faith and fair dealing requires the Government to refrain from taking actions that interfere with other contracting parties' enjoyment of the benefits contemplated by the contract.

123.    Through the Net Worth Sweeps the Government has breached the implied covenant of good faith and fair dealing by depriving Fannie Mae's shareholders of expected benefits under Fannie Mae's Charter.  Specifically, Fannie Mae's shareholders have a right, under Fannie Mae's Charter, to share in Fannie Mae's residual value.  But as a result of the Net Worth Sweeps, the Government has subverted the shareholders' right to participate in the residual value of Fannie Mae by sending Treasury all of Fannie Mae's profits and net worth, less a capital reserve that declines to zero in 2018.  Thus, the common shareholders are deprived of

any and all actual or potential value of the shares they own in perpetuity.

124.    As a result of the Government's breach of the covenant of good faith and fair dealing, Plaintiffs, as shareholders in Fannie Mae, have suffered damages in an amount to be determined at trial.

## CLAIM VI

### Breach of Contract

### Covenant of Good Faith and Fair Dealing Implied in Freddie Mac's Charter

#### (Direct Claim by Plaintiff Pershing Square)

125.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in the preceding paragraphs.

126.    Freddie Mac's Charter Act, 12 U.S.C. §1451, *et seq*. ("**Freddie Mac's Charter**"), is a contract between and among the Government, as the granter of the charter, Freddie Mac, and Freddie Mac's shareholders.  When the FHFA, as conservator of Freddie Mac, succeeded to all rights, titles, powers and privileges of Freddie Mac and its shareholders, officers or directors, *see* 12 U.S.C. §4617(b)(2)(A)(i), and was otherwise authorized to act on behalf of Freddie Mac and its shareholders, officers and directors, *see, e.g.*, *id*. §4617(b)(2)(B)-(D), (G)-(J), the Government also succeeded to Freddie Mac's position as a party to the contract that is Freddie Mac's Charter.

127.    Freddie Mac's Charter provides that:  "The common stock of the Corporation shall consist of voting common stock, which shall be issued to such holders in the manner and amount, and subject to any limitations on concentration of ownership, as may be established by the Corporation."  12 U.S.C. §1453.  Under general corporate law principles, a corporation's common shareholders have, collectively, a right to the corporation's residual value through a right to participate in the corporation's residual earnings and a right, upon dissolution, to share in any residual proceeds from liquidation of the assets.  Thus, under Freddie Mac's Charter, the

Government has agreed that common shareholders of Freddie Mac would have common stock vested with a right to the residual value of Freddie Mac, including to share in Freddie Mac's earnings.

128.    Freddie Mac has issued common stock.

129.    Because Freddie Mac's Charter is a contract, it imposes on the Government an implied covenant of good faith and fair dealing in its performance and enforcement of the contract.  The covenant of good faith and fair dealing requires the Government to refrain from taking actions that interfere with other contracting parties' enjoyment of the benefits contemplated by the contract.

130.    Through the Net Worth Sweeps the Government has breached the implied covenant of good faith and fair dealing by depriving Freddie Mac's shareholders of expected benefits under Freddie Mac's Charter.  Specifically, Freddie Mac's shareholders have a right, under Freddie Mac's Charter, to share in Freddie Mac's residual value.  But as a result of the Net Worth Sweeps, the Government has subverted the shareholders' right to participate in the residual value of Freddie Mac by sending Treasury all of Freddie Mac's profits and net worth, less a capital reserve that declines to zero in 2018.  Thus, the common shareholders are deprived of any and all actual or potential value of the shares they own in perpetuity.

131.    As a result of the Government's breach of the covenant of good faith and fair dealing, Plaintiff Pershing Square, as a shareholder in Freddie Mac, has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully pray for an order and judgment:

a.    On Claim I, awarding Plaintiffs just compensation under the Fifth Amendment for

the Government's taking of their property, in an amount to be determined at trial;

b.       On Claim II, awarding Fannie Mae just compensation under the Fifth Amendment for the Government's taking of its property, in amount to be determined at trial;

c.       On Claim III, awarding the Fannie Mae damages for the Government's illegal exaction of its money, in amount to be determined at trial;

d.       On Claim IV, V, and VI, awarding Plaintiffs damages, disgorgement, equitable restitution or other appropriate relief for the United States' breach of contract, in amount to be determined at trial;

e.       Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

f.       Granting such other, further and different relief as this Court deems just and proper.

By:  _____

Gregory P. Joseph
*Counsel of Record*

*Of Counsel*
Mara Leventhal
Sandra M. Lipsman
Christopher J. Stanley
Gregory O. Tuttle

JOSEPH HAGE AARONSON LLC
485 Lexington Avenue, 30th Floor
New York, New York  10017
Tel. (212) 407-1200
Fax (212) 407-1280
Email:  gjoseph@jha.com

*Counsel for Plaintiffs*

## **VERIFICATION**

I, Josephine Rattien, hereby verify and declare under penalty of perjury that I have reviewed the Verified Complaint, know the contents thereof, and authorize its filing. The foregoing is true and correct to the best of my knowledge, information, and belief, based on investigation of counsel.  I have personal knowledge of the facts stated in the Verified Complaint regarding my personal shareholdings, which are true and correct.

Executed on August *12*, 2015

Josephine Rattien

45

## **VERIFICATION**

I, Stephen Rattien, hereby verify and declare under penalty of perjury that I have reviewed the Verified Complaint, know the contents thereof, and authorize its filing. The foregoing is true and correct to the best of my knowledge, information, and belief, based on investigation of counsel. I have personal knowledge of the facts stated in the Verified Complaint regarding my personal shareholdings, which are true and correct.

Executed on August _12_, 2015

Stephen Rattien

## **VERIFICATION**

I, Louise Rafter, hereby verify and declare under penalty of perjury that I have reviewed the Verified Complaint, know the contents thereof, and authorize its filing. The foregoing is true and correct to the best of my knowledge, information, and belief, based on investigation of counsel. I have personal knowledge of the facts stated in the Verified Complaint regarding my personal shareholdings, which are true and correct.

Executed on August 14, 2015

Louise Rafter

47

## VERIFICATION

On behalf of Pershing Square Capital Management, L.P., Timothy L. Barefield hereby verifies and declares under penalty of perjury that I have reviewed the Verified Complaint, know the contents thereof, and authorize its filing. The foregoing is true and correct to the best of my knowledge, information, and belief, based on investigation of counsel. I have personal knowledge of the facts stated in the Complaint regarding Pershing Square Capital Management, L.P.'s ownership for beneficial interest in common shares of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation, which are true and correct. My execution of this verification on behalf of Pershing Square Capital Management, L.P. has been duly authorized by Pershing Square Capital Management, L.P.

Executed on August 13, 2015

_____
Timothy L. Barefield

766687